## CRUZ *v.* DOMÍNGUEZ.

### Apelación procedente de la Corte de Distrito de San Juan.

No. 50. *Resuelto en Junio 15, 1905.*

DIVORCIO.—DOMICILIO DE LOS CÓNYUGES.—SÚBDITOS ESPAÑOLES.—Los Tribunales de Puerto Rico tienen competencia para decretar el divorcio absoluto entre cónyuges que residan en la Isla, aunque el marido sea súbdito español, y á la

aplicación de esta doctrina no se oponen las disposiciones del art. 9 del Código Civil.

Id.—Es doctrina que puede considerarse como definitivamente establecida, la de que, en materia de divorcio, el domicilio de las partes es el determinante del derecho que ha de aplicarse al caso que se ventile.

Id.—REGLA DE DERECHO INTERNACIONAL.—OPINIÓN DE LA LEGISLATURA.—Las disposiciones del art. 9 del Código Civil no han de interpretarse en el sentido de establecer la regla de derecho internacional á que deban ajustarse los Tribunales de la Isla en materia de divorcio, y aún considerando que tales disposiciones pudieran expresar la opinión de la Legislatura sobre el particular, tal opinión no sería obligatoria para los Tribunales de Justicia.

Id.—PRINCIPIOS DE DERECHO INTERNACIONAL PRIVADO.—Siendo Puerto Rico un territorio de los Estados Unidos, los principios de derecho internacional privado que hayan de aplicar sus Tribunales, deben ser los mismos que se han desarrollado en los Estados Unidos, por lo menos en materia de divorcio.

Id.—TRATADO DE PARÍS.—ESTADO Y CONDICIÓN CIVIL DE LOS SÚBDITOS EXTRANJEROS.—Las disposiciones del art. 9 del Código Civil Español están en contradicción con las del art. 11 del Tratado de París, y mientras éste permanezca en vigor, las disposiciones del art. 9 del Código Civil de Puerto Rico no pueden interpretarse en el sentido de permitir que, por reciprocidad y cortesía, el derecho español regule el estado y condición civil de los súbditos españoles en Puerto Rico, pues éstos están sometidos, en materia civil y criminal, á la jurisdicción de las Cortes de este país y á las leyes ordinarias que las gobiernan.

Id.—CAMBIO DE SOBERANÍA.—Los súbditos españoles que residían en Puerto Rico cuando el cambio de soberanía tuvo lugar, y que alegaron su carácter de ciudadanos españoles, deberán justificar cumplidamente no haber perdido su nacionalidad por haber cumplido con las disposiciones del art. 9 del Tratado de París.

ESTATUTOS.—DIFERENCIAS ENTRE EL TEXTO INGLÉS Y EL ESPAÑOL.—En los casos en que hubiere diferencias entre el texto inglés de una ley y el texto español, el inglés ha de conceptuarse como texto original, por ser el firmado por el Gobernador, debiendo por consiguiente subordinarse á él el texto español.

DIVORCIO.—TRATO CRUEL É INJURIAS GRAVES.—La frase *cruel treatment,* usada en el No. 4 del art. 164 del texto inglés, del Código Civil, tiene una significación bastante amplia en la jurisprudencia moderna, para comprender cualquier caso en que se hubiere fundado la demanda en *injurias graves,* y que el Tribunal estime suficientemente probadas.

Id.—Para que el divorcio por injurias graves pueda prosperar, es necesario que las palabras ofensivas sean de tal naturaleza, ó estén acompañadas de tales actos que el malestar producido equivalga en sí mismo al trato cruel.

Id.—PRUEBAS.—DECLARACIONES DE PARIENTES, AMIGOS Ó SIRVIENTES.—Aunque la circunstancia de que los testigos sean parientes, amigos ó sirvientes de las partes, debe considerarse por el Tribunal en la apreciación de la prueba, y á su sano criterio queda el grado de credibilidad que haya de dar al testimonio de aquellos, sin embargo, hay que tener presente que en casos de divorcio hay que confiar generalmente en las declaraciones de parientes, amigos y sirvientes de las partes, y que el testimonio de tales personas se presume honrado á falta de prueba en contrario.

Id.—Las palabras *pelleja, puta,* y otras de análoga significación, dirigidas por el marido á su mujer, y acompañadas de actos de violencia que la infundan temor de ser atropellada, constituyen el *trato cruel* y las *injurias graves,* según la acepción general y corriente de estas voces, que como causa de divorcio señala el Código Civil.

Id.—La circunstancia de que los actos constitutivos del trato cruel y las injurias graves, fueran cometidos por el marido algunos meses antes de entablarse la demanda de divorcio, habiendo estado durante ese intérvalo ausente de su hogar, no puede obstaculizar el éxito de la acción, ya que no es necesario que ésta se entable inmediatamente.

Los hechos están expresados en la Opinión.

Abogado del apelante: *Sr. Bosch.*

Abogado del Pueblo: *Señor Rossy* (Fiscal.)

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del Tribunal.

El día siete de Febrero de mil ochocientos ochenta y ocho Moisés Domínguez y Martínez contrajo matrimonio con Doña Rafaela Cruz Soler, viuda de Don Domingo Lobato. El certificado del registro muestra que Domínguez era natural de España y residente en San Juan. Rafaela Cruz, natural de Puerto Rico, tenía también en aquella época su residencia en San Juan. El quince de Febrero de mil novecientos cuatro, la mencionada Rafaela Cruz, apelada ante esta Corte, entabló demanda de divorcio del vínculo matrimonial basándola en "en el trato cruel ó injurias graves" de acuerdo con el No. 4 del Artículo 164 del Código Civil de Porto Rico. La Corte de Distrito de San Juan concedió el divorcio y el apelante ante esta Corte ataca la sentencia principalmente por dos razones:

Primero. Que siendo español el demandado, y apelante, su estatuto personal, y por consiguiente el de su esposa, están regulados por las leyes de España, que no conceden á los súbditos españoles el divorcio absoluto.

Segundo. Que la Corte incurrió en error á dar crédito á los testigos del demandante, toda vez que la credibilidad de dichos testigos había sido impugnada por el demandado.

En Febrero de mil novecientos uno en el pleito de María del Cármen de Marimón contra Francisco Pelegrí y Roger, esta Corte resolvió que cuando las partes estaban domiciliadas en Puerto Rico las Cortes de la Isla tenían jurisdicción para conceder divorcio absoluto, aunque el marido fuera súbdito del Rey de España, sin embargo, el apelante sostiene que el Código Civil de Puerto Rico empezó á regir después de haberse resuelto

ese caso; que según el artículo 9 de ese Código las leyes de Puerto Rico regulan el estado y condición de sus ciudadanos en cualquier punto en que se encuentren; y que la reciprocidad y cortesía exigen que las Cortes de Puerto Rico apliquen las leyes de España al tratarse de súbditos españoles.

El caso de Pelegrí se resolvió en mil novecientos uno. En sus autos se encuentra la autorizada y desinteresada opinión del Attorney General de Puerto Rico en el mismo sentido en que se dictó posteriormente la resolución del Tribunal. De manera que cuando el Código Civil empezó á regir en mil novecientos dos ya había una doctrina establecida, no solamente por el Tribunal más alto de la Isla, sino también por la más alta autoridad ejecutiva que había de entender en asuntos legales. Bajo estas circunstancias no es posible suponer que la legislatura al aprobar la Sección 9 intentó cambiar la doctrina establecida con arreglo á las leyes existentes.

El artículo que se discute no establece la regla de derecho internacional que habríamos de seguir en asuntos de divorcio, pero aún suponiendo que expresara la opinión de la legislatura, hay autoridades que sostienen que no estamos obligados á seguirla. Véase Bischop sobre Matrimonio, Divorcio y Separación, Edición de 1891, Vol. 1. Sec. 12 y Vol. 2. Sec. 835.

Cuando se publicó la Obra de Story, titulada "Conflicto de Derechos" las Cortes de los varios Estados generalmente consideraban el domicilio de las partes como determinante del derecho que había de aplicarse. Hoy puede considerarse esa doctrina definitivamente establecida. Como expresa el apelado, copiando del dictámen del Sr. Harlan, las relaciones íntimas de los varios Estados, medios de comunicación, inmigración, y otras condiciones de carácter local han hecho que dicha doctrina sea imperativa ú obligatoria. Aun no estando esta

Isla bajo la jurisdicción de los Estados Unidos, el número de Españoles y demás extranjeros domiciliados aquí (y muchos casados con Puertorriqueñas) llevarían á los Tribunales puertorriqueños á aplicar sus propias leyes estatutarias. Sin embargo, Puerto Rico pertenecía á los Estados Unidos, y los principios de derecho internacional privado que sus Tribunales deberían seguir son naturalmente los que se han desarrollado en los Estados Unidos. A mayor abundamiento, aunque otro extranjero pudiera invocar el derecho de sus país, creemos que fué el propósito del Artículo II del Tratado de París establecer un estado de derecho distinto para los Españoles.

Dicho artículo establece lo siguiente:

"Los Españoles residentes en los territorios cuya soberanía cede ó renuncia España por este tratado, estarán sometidos en lo civil y en lo criminal á los Tribunales del país en que residan, con arreglo á las leyes comunes que regulen su competencia, pudiendo comparecer ante aquellos, en la misma forma y empleando los mismos procedimientos que deban observar los ciudadanos del país á que pertenezca el Tribunal."

En el caso de Pelegrí la Corte resolvió que la Sección 9 del Código Civil Español estaba en oposición con las prescripciones del tratado. Por igual razón mientras continúe en vigor dicho tratado no puede darse á nuestra propia sección 9 el efecto que pretende el Abogado de la parte apelante.

Debería añadirse que el apelante no ha probado claramente que sea súbdito español según las prescripciones del artículo 9 del Tratado de París. La única constancia que hay en los autos es la certificación del Cónsul español expedida en mil novecientos dos que expresa que el apelante residía en España y había estado en esta Isla desde el 28 de Octubre de 1901. Sin embargo, la certificación de matrimonio expresa que Domínguez residía en

San Juan en mil ochocientos noventa y ocho. Aunque su nacionalidad española sea un hecho absoluto, sin embargo, no ha probado que ha cumplido con las disposiciones del Tratado que prescribe:

"Los súbditos españoles, naturales de la Península, residentes en el territorio cuya soberanía España renuncia ó cede por el presente tratado, podrán permanecer en dicho territorio ó marcharse de él conservando en uno ú otro caso todos sus derechos de propiedad con inclusión del derecho de vender ó disponer de tal propiedad ó de sus productos; y además tendrán el derecho de ejercer su industria, comercio ó profesión sujetándose á este respecto á las leyes que sean aplicables á los demás extranjeros. En el caso de que permanezcan en el territorio, podrán conservar su nacionalidad española, haciendo ante una Oficina de registro, dentro de un año después del cambio de ratificaciones de este tratado, una declaración de su propósito de conservar dicha nacionalidad; á falta de esta declaración, se considerará que ha renunciado dicha nacionalidad y adoptado la del territorio en el cual pueden residir.

Los derechos civiles y la condición política de los habitantes naturales de los territorios aquí cedidos á los Estados Unidos se determinarán por el Congreso."

Es verdad que de los autos consta que fué á España en mil ochocientos noventa y nueve y estuvo allá dos años ó un tiempo así, pero no se ha demostrado que al regresar á España lo hiciera á los efectos del tratado, ó que, en cualquier tiempo después de su matrimonio, renunció ó hizo intención de renunciar su domicilio puertorriqueño.

Antes de pasar á la otra cuestión planteada por el apelante, es necesario considerar otro punto sugerido por el apelado y que es el conflicto entre el texto español y el texto inglés con respecto al No. 4 del Artículo 164 del Código Civil Las palabras inglesas son: "cruel treatment or grave injury". Las palabras españolas son: "el trato cruel ó injurias graves". No puede haber duda alguna con respecto á que el texto inglés que fué el fir-

mado por el Gobernador, es la ley que debe regir; pero
según la interpretación que hemos dadó á la frase "cruel
treatment" "trato cruel", estas palabras, con arreglo
á la jurisprudencia moderna son bastante amplias para
comprender cualquier caso en que consideramos suficien-
te la alegación en la demanda "de injurias graves". En
otras palabras, para que las frases ofensivas den al de-
mandante el derecho á obtener el divorcio deben ser de
tal naturaleza, ó ir acompañada de tales actos que el mal
estar producido equivalga en sí mismo al trato cruel.

Estamos de acuerdo con el segundo Considerando del
Tribunal inferior y con lo expresado por el Abogado
del apelado, de que los lazos de consanguinidad y amis-
tad, ó el hecho de haber sido sirviente deben tenerse en
cuenta por el Tribunal al considerar la prueba, el valor
probatorio que haya de darse á las manifestaciones de
testigos que se encuentren en esas circunstancias depen-
de del juicio que el mismo Tribunal haya formado.

Según el apelante no debe darse crédito alguno al tes-
timonio de los testigos porque eran, respectivamente, un
primo hermano, un amigo íntimo á quien mantenía, un
esclavo emancipado y criado de la casa de la demandante,
otro amigo íntimo, otro primo de un antiguo cocinero
á quien en ocasiones había dado de comer y otro sirviente.
Todas estas personas se presumen honradas y no se ha
presentado nada que nos dé el derecho de pasar por alto
las declaraciones de cualquiera de ellas.

En esta clase de pleitos hay que confiar generalmente
en el testimonio de parientes, amigos y sirvientes por
cuya razón la Corte Inferior no cometió error alguno al
considerar dichas declaraciones, no se practicó prueba
alguna por parte del demandado.

Nos queda por considerar si la prueba es suficiente
para constituir un caso de trato cruel. Los testigos no
son concretos con respecto á fecha y lugar, pero el de-

mandado por medio de preguntas, pudo haberles hecho contestar de modo más preciso. No se ha planteado cuestión alguna de prescripción.

El apelante no solamente insultó gravemente á su esposa llamándolo "pelleja" "puta", y usando otras palabras de significación semejante, sino que la amenazó, si realmente no llegó á pegarle, según se desprende de las declaraciones de los testigos Miranda, Juan Soler y Masana. Esta línea de conducta, si no puso en peligro su vida ó alteró su salud, era suficiente para producir el temor de que se ejerciera violencia física y por consiguiente era el trato cruel á que se refiere el Estatuto, si es que ha de darse á las palabras su significación cómún, según el Artículo 14 del Código Civil. Véase Am. & Eng. Enc. of Law, 2nd Edition, Vol. 9, p. 799; Bischop on Marriage Divorce & Separation, paragraph 15669.

Puede ser verdad lo alegado por el apelante de que todos estos actos tuvieron lugar antes de marchar él á España, unos días antes de entablarse la demanda, pero el apelado no tenía obligación alguna de entablar inmediatamente la demanda y pudiera ser muy bien que el regreso de su marido le causara nuevos terrores y la indujera á aprovecharse del derecho que le daba la conducta seguida por él.

Desde luego que la sentencia de la Corte de Distrito disolviendo el matrimonio entre las partes, debe sostenerse.

*Confirmada.*

Jueces concurrentes: Sres. Presidente Quiñones y Asociados Hernández, Figueras y MacLeary.