GEORGINA LUISA LOKPEZ FINLAY, demandante y apelante, *v.* ANGEL FERNÁNDEZ VIDAL, demandado y apelado.

Núm. 8506.—*Sometido:* Noviembre 12, 1942. *Resuelto:* Marzo 10, 1943.

524

*Mariano Acosta Velarde, Federico Acosta Velarde* y *Daniel Pellón, Jr.,* abogados de la apelante; *E. H. F. Dottin,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

.La cuestión cardinal a resolver en este recurso es si, de acuerdo con los hechos probados, al interpretar el artículo 9 del Código Civil preceptivo de que ''las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal de las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros'', debe aplicarse la doctrina de la nacionalidad prevaleciente en Europa, o la doctrina del domicilio que prevalece en los Estados Unidos o en Inglaterra. Secundariamente a esta cuestión y dependiendo de la forma en que sea resuelta, tendríamos que determinar, por otros motivos en cuanto a la validez o nulidad de la resolución dictada por la Corte de Distrito de San Juan en un expediente de utilidad y necesidad autorizando la venta de bienes inmuebles de la demandante cuando era menor de edad.

De la prueba presentada en la corte inferior, según aparece de la transcripción de evidencia, consideramos que son hechos probados los siguientes:

Que la petición de autorización judicial que motivó este pleito se radicó en la corte inferior en agosto 13 de 1934 y en ella Víctor Lokpez, como padre con patria potestad sobre su hija menor de edad Georgina Luisa Lokpez Finlay, solicitó permiso de la corte para vender en pública subasta un solar que la demandante había heredado de su madre, alegando que la venta de dicho solar era de utilidad y necesidad para la menor, debido a que el solar en cuestión formaba parte de una finca que se había urbanizado para la venta de solares y la cual no producía renta alguna, y por los motivos adicionales de que le hacía falta dinero a la menor para atender a la administración de otros bienes y para sus gastos personales. La vista de la petición se celebró tres días después de su radicación sin la comparecencia del fiscal de distrito, practicándose la misma prueba documental y testifical que sirvió de base para otra solicitud similar que había ante la misma corte para la venta de otro solar en la misma urbanización perteneciente a la menor. Después de la vista pasó el expediente con el récord taquigráfico al fiscal informando dicho funcionario que no se oponía a su aprobación y como consecuencia la corte dictó una resolución declarando con lugar la solicitud y ordenando al márshal que procediera a vender en pública subasta el solar objeto de la misma por el precio mínimo de $5 por metro cuadrado de superficie, lo que hizo dicho funcionario después de publicar los edictos exigidos por ley y fijar los avisos de subasta en el sitio de costumbre en los pasillos de la corte. El único licitador en dicha subasta lo fué el aquí demandado Angel Fernández Vidal, a quien se le adjudicó el solar por haber ofrecido el precio mínimo fijado por la corte y haber entregado una suma total de $1,825.10, habiéndole más tarde el márshal otorgado la correspondiente escritura de compraventa judicial.

La demandante inició esta acción para reivindicar el solar alegando para ello la nulidad de la resolución dictada por la corte inferior en el expediente anteriormente mencionado,

por el motivo principal de que su padre nunca tuvo la patria potestad sobre ella debido a que ella nació en la ciudad de New York de padres que contrajeron matrimonio en Connecticut y luego se domiciliaron en New York en cuya ciudad falleció su madre y que de acuerdo con el estatuto personal la ley de New York era la que regulaba sus relaciones de familia no existiendo en dicho Estado la patria potestad y por lo tanto su padre no podía incoar el procedimiento sobre autorización judicial. Alegó además la demandante que dicho procedimiento es nulo por haberse celebrado la vista sin la asistencia del fiscal; porque en la solicitud no se alegó la causa que la motivó ni la necesidad y utilidad para la menor en cuanto a la venta del inmueble; porque no se alegó la edad exacta de la menor ni la del solicitante; porque no se practicó prueba testifical o documental; porque no se registró en el libro de sentencias la resolución autorizando y decretando la venta ni se notificó por el secretario dicha resolución al fiscal, al peticionario o a la menor, y además, porque los edictos anunciando la venta no se publicaron en los sitios que exige la ley. La corte inferior declaró sin lugar la demanda en este caso.

■■ La prueba demuestra además los siguientes hechos: Que Víctor Luis Lokpez, cubano y Josefina Finlay Van Ryhn, puertorriqueña, contrajeron matrimonio en la ciudad de Greenwich, Connecticut, el 21 de septiembre de 1916; que se trasladaron después a New York y allí nació la demandante el 4 de junio de 1917; que dos años después, el 22 de marzo de 1919, murió la madre de la demandante en dicha ciudad; que en el año 1923, cuando la demandante tenía seis años, se trasladó con su padre que ya había contraído segundas nupcias con Herminia Ruiz, de Mayagüez, a Caracas, Venezuela, y allí vivieron hasta el año 1930 dedicado Lokpez al negocio de automóviles; que en el año 1929 Lokpez vino a Puerto Rico solo al enterarse que un apoderado que él tenía aquí había fallecido, y después de arreglar sus asuntos fué a Santo Domingo y se casó en terceras nupcias con Lil-

lian de Soto; que Lokpez volvió a Caracas y en el 1930 volvió a embarcar con la demandante para Puerto Rico donde permanecieron dos meses trasladándose entonces Lokpez, su nueva esposa y la demandante a Puerto Príncipe, Haití, donde Lokpez desempeño el cargo de *Attaché d'Affaires* de Cuba en dicha ciudad hasta fines de 1932, viviendo en la Legación Cubana; que en julio de 1932 Lokpez trajo a la demandante a Puerto Rico y de aquí la envió a vivir con su primera madrastra Herminia Ruiz, a Caracas, retornando Lokpez a Puerto Príncipe donde permaneció hasta diciembre de 1932, habiéndose entre tanto divorciado de su tercera esposa; que en diciembre de 1932 Lokpez volvió a Puerto Rico donde contrajo cuartas nupcias con Borinquen Gómez y se trajo a la demandante a vivir con él embarcándola a los pocos meses para los Estados Unidos a estudiar en New York diciéndole que al mes siguiente se iría con su señora a vivir permanentemente con ella, pero esto no obstante el hecho es que Lokpez permaneció en Puerto Rico hasta el año 1934, según la demandante viviendo en un "boarding house" cuando ella se embarcó. Durante este año de 1934 Lokpez fué a New York con su esposa, donde estuvo dos meses, pero regresó a Puerto Rico y fué en esta época, en agosto 13 de 1934, que Lokpez radicó la solicitud de autorización judicial a que nos hemos referido anteriormente. Se probó además que Lokpez volvió a los Estados Unidos a principios de 1935 pero en abril ya había regresado a Puerto Rico donde permaneció hasta el mes de octubre cuando volvió a New York con su esposa permaneciendo hasta mayo de 1936 regresando con su esposa a Puerto Rico, la dejó aquí y volvió a New York en el mes de junio para asistir a la graduación de la demandante. En julio de 1936 regresó Lokpez a Puerto Rico con la demandante y en el mes de agosto ésta hizo y firmó en la Secretaría Ejecutiva de Puerto Rico una solicitud para que se le expidiera un pasaporte, el que le fué expedido y en el mes de agosto volvieron a embarcar para New York vía Cuba, Lokpez, su esposa y la demandante y allí perma-

necieron hasta el mes de noviembre en que embarcaron todos para Francia donde permanecieron hasta el mes de enero de 1937 en que regresaron a New York volviendo Lokpez a Puerto Rico con su esposa en el mes de febrero y de ahí en adelante, según la propia declaración de la demandante, su padre hacía viajes continuamente de Puerto Rico a Méjico donde había ido a residir la demandante, y de Puerto Rico a New York.

En la petición bajo juramento hecha por la demandante al Gobernador de Puerto Rico para que se le expidiera un pasaporte en el mes de agosto de 1936, hizo constar entre otras cosas lo siguiente (traducimos):

"Que he residido continuamente en los Estados Unidos desde mi nacimiento hasta 1920, y desde 1929 hasta la fecha en New York y Puerto Rico; que estoy domiciliada en los Estados Unidos, *siendo mi residencia permanente en Ponce de León 175 en la ciudad de Santurce, isla de Puerto Rico,* y que he residido fuera de los Estados Unidos como sigue: Venezuela, desde 1920 a 1929."

Y más adelante hizo constar lo siguiente: "Mi padre Víctor L. Lokpez nació en la Habana, Cuba, en 1877 *y reside ahora en Santurce, Puerto Rico".* Asimismo en el pasaporte que le fué expedido la demandante hizo constar de su puño y letra que en caso de muerte o accidente se notificara a "Dr. Víctor Luis Lokpez, *P. O. Box 3335, Santurce, Puerto Rico".*

La corte inferior en la opinión que dictó para sostener su sentencia declarando sin lugar la demanda, no obstante haber hecho un análisis de la prueba presentada, no hizo determinación alguna específica en cuanto al domicilio del padre de la demandante, a pesar de que aplicó la doctrina americana del domicilio y no la europea de la nacionalidad. Al así hacerlo, sin embargo, sentó la siguiente premisa:

"Dadas las circunstancias concurrentes, *asumiremos* la posición más favorable a la demandante; que tanto ella como su padre estaban *domiciliados en* New York durante la tramitación del caso 21429. (Bastardillas nuestras.)

De acuerdo con esta premisa la corte inferior resolvió que los derechos y deberes de familia entre la demandante y su padre en el año 1934 deben regularse por las leyes de ese Estado; pero a pesar de que en el Estado de New York no existe la institución de patria potestad tal y como rige en Puerto Rico y que para que bienes inmuebles pertenecientes a un menor puedan ser vendidos se requiere el nombramiento de un "Special Guardian" (véase título 7, sección 2352, "Consolidated Laws of the State of New York," capítulo 14 del "Domestic Relation Law," admitido como prueba de la demandante, *Exhibit* "E"), la corte inferior haciendo referencia únicamente a las secciones 80 y 83 del capítulo 14 de la antes mencionada Domestic Relation Law de New York al efecto de que cuando a un menor no se le ha designado tutor la tutela de su propiedad en todos los derechos de un "guardian in socage" pertenece a los padres y que dicho "guardian in socage" entre otras tiene la facultad de administrar los bienes de su pupilo, concluye diciendo que "todos los derechos y obligaciones que comprende el concepto de patria potestad con respecto a la persona de los hijos existen en New York aun cuando el conjunto de todos esos derechos y obligaciones no sean allí conocidos por ese nombre. En su último extremo creemos que patria potestad no significa otra cosa que el derecho que tiene el padre de tener al hijo bajo su custodia con el propósito de poder cumplir las obligaciones impuestas por la ley".

Somos de opinión que la corte inferior erró al asumir, sin resolver expresamente, que el domicilio de Lokpez y su hija en el año 1934 era New York, y que asimismo es errónea la conclusión a que llegó en cuanto a que los poderes de un padre domiciliado en New York sobre los bienes de su hijo menor de edad equivalen a los de un padre domiciliado en Puerto Rico con patria potestad sobre un hijo menor de edad. La sección 83 del capítulo 14 a que se refiere la corte inferior sólo autoriza al "general guardian" o al "guardian in socage" a administrar los bienes de su pupilo y le pro-

hibe expresamente el venderlos; mientras que por la sección 2352 del título 7 se requiere el nombramiento expreso de un "special guardian" para poder vender, hipotecar o arrendar cualquier inmueble de un menor, previa prestación de una fianza. De manera, que aun cuando pudiera prevalecer la asunción que hizo la corte inferior en cuanto al domicilio de la demandante y su padre en New York, no podría prevalecer la validez de la comparecencia en una corte de Puerto Rico del padre, comó padre con patria potestad, solicitando la venta de un inmueble del menor con fines de utilidad y necesidad.

Que la propia corte inferior se dió cuenta de la importancia de esta cuestión, lo demuestra el hecho de que al final de su opinión y con marcada incongruencia a lo que anteriormente había resuelto, se expresó en la siguiente forma:

"No deseamos terminar esta opinión sin volvernos a referir a la patria potestad de Víctor Lokpez sobre la demandante al radicar su solicitud sobre autorización judicial. Dada nuestra resolución de que ella dependía del domicilio del padre esta cuestión jurisdiccional dependía en último término de un hecho: la vecindad y domicilio del padre. . .

"En este caso específico se alegó en la petición en el caso 21429 que tanto el peticionario como su hija eran vecinos de San Juan. 'Vecino' significa domiciliado. Escriche, Diccionario de Legislación y Jurisprudencia, Tomo 2, pág. 1526. *Y al decretar esta corte la venta ella fué una adjudicación implícita de que Víctor Lokpez y por tanto su hija estaban domiciliados en San Juan, máxime cuando en su resolución la corte expresamente describió a la demandante como vecina de San Juan.*" (Bastardillas nuestras.)

Tenemos, por lo tanto, que aparentemente la corte inferior primero *asume* que la demandante y su padre estaban domiciliados en New York y a pesar de eso aplica las leyes de Puerto Rico sobre patria potestad, para luego concluir que la propia corte, implícitamente, había resuelto que Lokpez y su hija estaban domiciliados en San Juan. Si hay algo definitivamente resuelto en cuanto al domicilio de una persona se refiere es que sólo puede tener un domicilio. Véase

art. 11, Código Político de Puerto Rico; *Restatement, Conflict of Laws*, Sec. 11: "Toda persona tiene en todo tiempo un domicilio, y ninguna persona tiene más de un domicilio a un mismo tiempo."

Resalta aún más la inconsistencia de la conclusión de la corte inferior si tomamos en consideración el hecho de que al resolver que en la interpretación del artículo 9 de nuestro Código Civil debía prevalecer la doctrina del domicilio lo hizo, a nuestro juicio, correctamente, al expresarse, en parte, así:

". . . El propio artículo 9, supra, habla de ciudadanos de Puerto Rico y no de ciudadanos americanos dando a entender con ello su propósito de seguir la teoría americana del domicilio y no la europea de la nacionalidad. . . .

"\* \* \* \* \* \* \*

"Está bien que se diga que el Código Civil Español está inspirado en el principio de la nacionalidad pues su artículo 9 habla de *españoles;* no así nuestro artículo 9 equivalente al del Código Español del mismo número que habla, como ya hemos dicho, de ciudadanos de Puerto Rico cuyo término incluye también a los americanos continentales domiciliados en Puerto Rico. Nos interesa, por tanto, saber cuál era el domicilio de la demandante en el año 1934 cuando se tramitó el expediente de utilidad y necesidad objeto de este pleito."

Ahondemos un poco más en el estudio de esta cuestión.

Manresa, al comentar el artículo 9 del Código Civil de España, igual que el de Puerto Rico con excepción de que donde el nuestro dice "ciudadanos de Puerto Rico" el de España dice "a los españoles", expone que "Las condiciones que han de reunirse para gozar del estatuto personal . . . se fijan en el título primero del hecho primero de este Código al determinarse quiénes son españoles".

El título primero del libro primero del Código Civil de España trata "De las personas" y "De los Españoles y Extranjeros", mientras que los correspondientes título y libro de nuestro Código Civil tratan "De las Personas" y "De la distinción de las personas", refiriéndose en los capítulos de este último a las personas naturales y jurídicas. La en-

mienda es fácil de explicar. Desde el cambio de soberanía en Puerto Rico es el Congreso de los Estados Unidos el que ha determinado quiénes son ciudadanos de Puerto Rico, primero por el Acta Foraker y más tarde por el Acta Jones. La sección 7 del Acta Foraker, en parte, dispone:

"Sección 7.—Que todos los habitantes que continúen residiendo allí, los cuales eran súbditos españoles el día once de abril de mil ochocientos noventa y nueve, y a la sazón residían en Puerto Rico, y sus hijos con posterioridad nacidos allí, *serán tenidos por ciudadanos de Puerto Rico*, y como tales, con derecho a la protección de los Estados Unidos; . . ." (Bastardillas nuestras.)

Mientras que el artículo 5 del Acta Jones, dispuso, en parte, que:

"Artículo 5. Todos los ciudadanos de Puerto Rico, según se definen en la Sección 7 de la Ley de 12 de abril de 1900, 'Para proveer, temporalmente, de rentas y un gobierno civil a Puerto Rico, y para otros fines,' y todos los nativos de Puerto Rico que estaban temporalmente ausentes de la Isla en 11 de abril de 1899, y hayan regresado después y estén residiendo permanentemente en dicha isla, y no sean ciudadanos de ningún país extranjero, *se declaran por la presente ciudadanos de los Estados Unidos*, y serán considerados y tenidos como tales; Disponiéndose, que cualquier persona de las descritas anteriormente podrá conservar *su presente status político*, haciendo una declaración, bajo juramento, de su resolución a ese efecto, dentro de seis meses de haber entrado en vigor esta Ley, ante el Tribunal de Distrito del distrito en que resida, declaración que se hará en la forma siguiente: . . ." (Bastardillas nuestras.)

Y en el artículo 5 *a*, insertado por Ley del Congreso de 4 de marzo de 1927 se determinó de nuevo quiénes son los ciudadanos de Puerto Rico en esta forma:

"Artículo 5 a.—Todos los ciudadanos de los Estados Unidos *que han residido, o que en lo sucesivo residieren, en la isla por un año, serán ciudadanos de Puerto Rico;* Disponiéndose, que las personas nacidas en Puerto Rico de padres extranjeros, a las cuales se refiere el último párrafo del artículo 5, que no se aprovecharon del privilegio de hacerse ciudadanos de los Estados Unidos, tendrán un período de un año desde la aprobación de esta ley para hacer la declaración prescrita en el predicho artículo; Y disponiéndose, además,

que las personas que eligieron retener *el status político de ciudadanos de Puerto Rico,* podrán dentro de un año después de la aprobación de esta ley, hacerse ciudadanos de los Estados Unidos en los mismos términos y en la misma forma que se dispone para la naturalización de nativos puertorriqueños nacidos *de padres* extranjeros.'' (Bastardillas nuestras.)

Tenemos, pues, que el concepto de ciudadanos de Puerto Rico ha variado sustancialmente bajo las dos actas orgánicas que hemos tenido.

Bajo el Acta Foraker todos los habitantes que eran residentes y continuaron residiendo en Puerto Rico y que eran súbditos españoles el 11 de abril de 1899 y sus hijos nacidos posteriormente aquí eran ''ciudadanos de Puerto Rico''. Se constituyó un *status* político con dicho nombre según lo revela expresamente el artículo 5 del Acta Jones, supra, al proveer la forma en que esas personas podían conservar ''su presente status político'' y también el artículo 5 *a,* supra, al proveer un nuevo término para que las personas que eligieran ''retener el status político de ciudadanos de Puerto Rico'' pudieran hacerse ciudadanos de los Estados Unidos.

Bajo el Acta Jones, sin embargo, la frase ''ciudadanos de Puerto Rico'' tiene un concepto distinto. Ya no implica el de un status político general sino meramente el de un status político restringido al de la *residencia* en Puerto Rico. ¿De quiénes? De los ''ciudadanos de los Estados Unidos que han residido o que en lo sucesivo residieren en la isla por un año''. En otras palabras, bajo el Acta Jones se estableció la dualidad de ciudadanía que tenían todos los ciudadanos de los Estados Unidos en los Estados; la nacional y la del Estado en que residan. Así, un ciudadano de los Estados Unidos que resida en New York es además ciudadano del Estado de New York. Y en Puerto Rico los ciudadanos de Estados Unidos que residan un año en Puerto Rico también son ciudadanos de Puerto Rico. Tenemos, por lo tanto, que los ciudadanos de Puerto Rico a que se refiere el artículo 9 del Código Civil, después de regir el Acta Jones

tienen que ser aquellos ciudadanos que tenían dicho concepto bajo nuestra acta constitucional o sea a los ciudadanos de los Estados Unidos residentes por más de un año en Puerto Rico. Siendo esto así, parece obvio que la doctrina que debe prevalecer en Puerto Rico en la interpretación del artículo 9, supra, en cuanto a los ciudadanos de Puerto Rico, es la del domicilio, imperante en los Estados Unidos, y no la de la nacionalidad que rige en España, Italia y los países europeos. Por otros motivos, Manresa así lo reconoce al decir: "los Estados europeos deben aceptar la ley de nacionalidad; los de América, la del domicilio. Esta diferencia obedece al modo de ser de ambos, pues en unos la población tiende a la permanencia, y en los otros es variable por la emigración." 1 Manresa, Código Civil, 104.

Al así interpretar el efecto que la enmienda al concepto de ciudadanos de Puerto Rico causó la aprobación del Acta Jones en 1917 con su adición del artículo 5 a en el año 1927, damos vida al concepto nacional que tiene la ciudadanía de los Estados Unidos que ostentamos. Sólo somos ciudadanos de Puerto Rico en el sentido de que somos residentes de Puerto Rico, teniendo la palabra residente el alcance de domicilio. El mismo efecto tiene la ciudadanía de un Estado de la Unión en relación con la ciudadanía nacional, ya que, cuando un ciudadano de los Estados Unidos domiciliado en un Estado se traslada permanentemente a otro o a un país extranjero pierde la ciudadanía de dicho Estado.

Para poder aplicar la doctrina de la nacionalidad de la demandante en este caso tendríamos que acudir, no a las leyes del Estado de New York que no es una nación, sino a las leyes de los Estados Unidos, y nos encontraríamos con que no existe ley federal alguna que aplicar por la sencilla razón de que en los Estados Unidos las relaciones de familia se regulan por las leyes de cada Estado. Nos encontraríamos, como dice la corte inferior "con la enorme dificultad de no saber cuáles son los derechos de la demandante", una situación intolerable en una comunidad civilizada. Es insos-

tenible, por tanto, la argumentación de la demandante de pretender aplicar la doctrina de la nacionalidad alegando su condición de ciudadana del estado de New York cuando esa circunstancia no dependía del hecho de haber ella nacido en dicho estado sino del domicilio que ella tenía en el año 1934.

Se arguye por la apelante que esta Corte Suprema en los casos de *Antongiorgi* v. *Registrador,* 6 D.P.R. 239 y *Bartholomew* v. *Allen,* 24 D.P.R. 370, ambos resueltos mientras regía el Acta Foraker, aplicó la doctrina de la nacionalidad en relación con ciudadanos de los Estados Unidos residentes en New York por el hecho de no regir la sociedad de gananciales en dicho estado. Pero, los hechos en dichos casos demuestran que las personas que enajenaron sin el consentimiento de sus esposas, bienes inmuebles adquiridos después del matrimonio celebrado en New York, eran tanto ciudadanos de los Estados Unidos como de New York, aplicándose, de hecho, la doctrina del domicilio.

En nuestra propia jurisprudencia y cuando de una institución que afecta al Estado se refiere, como lo es el matrimonio y su disolución por divorcio (y no puede dudarse que en las relaciones de padre e hijo también el Estado tiene un interés primordial), encontramos que desde el año 1902 esta Corte adoptó la doctrina del domicilio y no la de la nacionalidad al interpretar y aplicar el estatuto personal. Siguiendo la pauta contenida en el informe rendido por el entonces Attorney General, James S. Harlan, en el caso de *Marimón* v. *Pelegrí,* 2 Sentencias de Puerto Rico 331, se resolvió que la *lex fori* es aplicable a los casos de divorcio y que los tribunales del Estado del domicilio de la parte tienen jurisdicción para decretar el divorcio de acuerdo con sus leyes.

Más tarde, en el año 1905 y en el caso de *Cruz* v. *Domínguez,* 8 D.P.R. 580, se expresó esta Corte por voz del Juez Asociado Sr. Wolf, en esta forma:

"En febrero de mil novecientos uno en el pleito de María del Carmen de Marimón contra Francisco Pelegrí y Roger, esta Corte

resolvió que cuando las partes estaban domiciliadas en Puerto Rico las Cortes de la Isla tenía jurisdicción para conceder divorcio absoluto, aunque el marido fuera súbdito del Rey de España, sin embargo, el apelante sostiene que el Código Civil de Puerto Rico empezó a regir después de haberse resuelto ese caso; que según el artículo 9 de ese Código las Leyes de Puerto Rico regulan el estado y condición de sus ciudadanos en cualquier punto en que se encuentren; y que la reciprocidad y cortesía exigen que las Cortes de Puerto Rico apliquen las leyes de España al tratarse de súbditos españoles.

"El caso de Pelegrí se resolvió en mil novecientos uno. En sus autos se encuentra la autorizada y desinteresada opinión del Attorney General de Puerto Rico en el mismo sentido en que se dictó posteriormente la resolución del Tribunal. De manera que cuando el Código Civil empezó a regir en mil novecientos dos ya había una doctrina establecida, no solamente por el Tribunal más alto de la Isla, sino también por la más alta autoridad ejecutiva que había de entender en asuntos legales. Bajo estas circunstancias no es posible suponer que la legislatura al aprobar la Sección 9 intentó cambiar la doctrina establecida con arreglo a las leyes existentes.

"El artículo que se discute no establece la regla de derecho internacional que habríamos de seguir en asuntos de divorcio, pero aún suponiendo que expresara la opinión de la legislatura, hay autoridades que sostienen que no · estamos obligados a seguirla. Véase Bishop *sobre Matrimonio, Divorcio y Separación*, Edición de 1891, Vel. 1, Sec. 12 y Vol. 2, Sec. 835.

"Cuando se publicó la obra de Story, titulada 'Conflicto de Derechos' las Cortes de los varios Estados generalmente consideraban el domicilio de las partes como determinante del derecho que había de aplicarse. *Hoy puede considerarse esa doctrina definitivamente establecida.* Como expresa el apelado, copiando del dictamen del Sr. Harlan, las relaciones íntimas de los varios Estados, medios de comunicación, inmigración, y otras condiciones de carácter local han hecho que dicha doctrina *sea imperativa u obligatoria.* Aun no estando esta Isla bajo la jurisdicción de los Estados Unidos, el número de Españoles y demás extranjeros domiciliados aquí (y muchos casados con Puertorriqueñas) llevarían a los Tribunales puertorriqueños a aplicar sus propias leyes estatutarias. Sin embargo, Puerto Rico pertenecía a los Estados Unidos, *y los principios de derecho internacional privado que sus Tribunales deberían seguir son naturalmente los que se han desarrollado en los Estados Unidos. . ."* (Bastardillas nuestras.)

Tenemos ante nos el informe del Attorney General Harlan, al que se hace referencia en el caso de *Cruz* v. *Domínguez,* supra. Está escrito desde Essex, N. Y., en septiembre de 1901 y dirigido al entonces Fiscal de esta Corte Hon. Emilio del Toro, hoy nuestro Juez Presidente, y nos parece de justicia citar del mismo algunos párrafos que en forma brillante tratan esta cuestión. Dicen así:

". . . Los Estados Unidos son una unión de estados, cada uno de los cuales es soberano dentro de su propia esfera, estando, sin embargo, subordinados todos al gobierno central.

"Cada uno de los Estados, dentro de la esfera de su competencia legislativa, puede promulgar leyes que gobiernen la condición personal de sus ciudadanos. Cada uno de los 45 Estados, por lo tanto, tiene su propia jurisprudencia *y su propio sistema de leyes referentes a las relaciones domésticas,* y su propio sistema de leyes referentes a la propiedad y derechos de propiedad. Pero, por otra parte, los Estatutos de los Estados Unidos *no contienen leyes con respecto al matrimonio o referentes al divorcio. Ni tampoco se refieren dichos Estatutos a la relación de marido y mujer, padres e hijos, amos y sirvientes, tutor y pupilo,* ni contienen ley alguna con respecto al título de posesión de bienes raíces y propiedad personal, o referentes a la sucesión o transmisión por herencia de tal propiedad.

"De esto se deduce, que mientras un ciudadano de los Estados Unidos domiciliado en el extranjero, *puede invocar su nacionalidad y apelar a las leyes de los Estados Unidos como determinando su estado político en el extranjero, no puede alegar su nacionalidad como determinando también su estado personal. Su estado personal está fijado solamente por las Leyes del Estado de que él es ciudadano, y como un Estado de los Estados Unidos no tiene nacionalidad ni carácter internacional alguno, su nacionalidad no puede propender a fijar su estado personal en países extranjeros. Nacionalidad, tal como esta palabra se usa en la Ley Internacional privada, para fijar la condición personal, no existe, ni ha existido nunca en la jurisprudencia de los Estados Unidos.*

"*Y como los Estados Unidos no pueden insistir en la adopción de la nacionalidad como punto de partida para fijar la Ley personal de sus ciudadanos residentes o domiciliados en el extranjero, nuestra jurisprudencia americana no permite que se alegue la nacionalidad en este sentido a favor de extranjeros o forasteros residentes o domiciliados aquí. El único hecho determinante en los Estados Unidos*

*para fijar la condición personal de un extranjero que reside dentro de sus fronteras, es el domicilio. El sistema Americano exige que donde quiera que se hallen domiciliados sus ciudadanos, gocen de los beneficios de la Ley de aquel domicilio. Dicho sistema insiste, por otra parte, en que toda persona que esté domiciliada dentro de los Estados Unidos, sea cual fuere su nacionalidad, estará sujeta a las leyes de ese domicilio, y tendrá derecho a los beneficios de dichas leyes.''* (Bastardillas nuestras.)

Cuán correctamente supo enfocar este problema el Sr. Harlan, lo demuestra que la misma opinión sustenta· el profesor Joseph H. Beale (repórter del *Restatement, Conflict of Laws*) en su obra sobre la materia, volumen 3, página 1934, cuando dice:

''Interesantes y atractivos como son los argumentos en favor de la adopción de la nacionalidad como determinante de derechos personales, hay por desgracia una dificultad práctica que hace imposible para una nación federada como es Estados Unidos el aceptar la doctrina. Como cada Estado es una unidad legal separada, mientras que todos forman una sola nación, no hay ninguna ley de la nación que pueda determinar derechos.''

Se nos dirá que Puerto Rico no es un Estado de los Estados Unidos; pero la ciudadanía americana y la forma de gobierno que nos concedió el Acta Jones, así como la determinación y fijación del concepto de ciudadanos de Puerto Rico en ella contenidos, hacen inevitable la conclusión de que en la interpretación y aplicación del artículo 9 del Código Civil debe prevalecer la doctrina del domicilio y no la de la nacionalidad.

El efecto de esta conclusión en cuanto a ciudadanos de Puerto Rico se refiere no significa, sin embargo, que la misma doctrina del domicilio no deba aplicarse a los extranjeros domiciliados en Puerto Rico. Como dijo el Sr. Harlan en su informe ''el único hecho determinante en los Estados Unidos para fijar la condición personal de un extranjero que reside dentro de sus fronteras, es el domicilio.'' Esta fué la regla aplicada por esta Corte en los casos de *Cruz* v. *Do-*

*mínguez,* y *Marimón* v. *Pelegrí,* supra, y es la única que, constitucionalmente, puede prevalecer de acuerdo con el artículo 2 del Acta Jones preceptivo de que no se pondrá en vigor en Puerto Rico ninguna ley "que negare a una persona de dicha isla la protección igual de las leyes". Hacemos esta aclaración por el hecho de que el padre de la demandante era cubano y no un ciudadano de Puerto Rico dentro del concepto de nuestra Carta Orgánica, pero ese hecho en nada afecta la aplicación de las reglas generales sobre domicilio previstas en el artículo 11 del Código Político, *infra,* para la determinación de la jurisdicción de la corte inferior para conocer del caso sobre utilidad y necesidad de la venta del solar de la demandante.

La demandante por el hecho de haber nacido en New York es ciudadana de los Estados Unidos pero, durante su minoridad, por una ficción de ley, aunque residiera en New York su domicilio era el de su padre. Mientras éste tuvo su domicilio en New York la demandante era ciudadana del Estado de New York pero cuando ella se trasladó con él a Venezuela y allí establecieron su domicilio, ella perdió su ciudadanía neoyorquina, pues la "ciudadanía estatal" y el domicilio son substancialmente sinónimos, 14 C.J.S., *Citizens,* Sec. 1 *b.* Es a virtud de la Enmienda Catorce de la Constitución de los Estados Unidos que todas las personas nacidas o naturalizadas en los Estados Unidos y sujetas a su jurisdicción, son ciudadanos de los Estados Unidos y del Estado donde residen y la demandante por nacimiento es ciudadana de los Estados Unidos, no importa que su padre fuera cubano, *U. S.* v. *Wong Kim Ark,* 169 U. S. 649, y mientras su padre continuó su domicilio en New York ella seguía siendo ciudadana del Estado de New York. Su domicilio de origen fué New York pero cuantas veces su padre cambió de domicilio, mientras ella era menor de edad, otras tantas cambió el domicilio de la demandante. Restatement, Conflict of Laws, Sec. 30 *c,* donde se dice además que: "El hecho de que el menor viva separado de su padre, con su permiso o

540

sin él, es inmaterial. El menor no tiene poder para adquirir un domicilio por elección (*domicile of choice*) ni puede el padre fijarle el domicilio al menor en ningún sitio que no sea allí donde el padre tiene el suyo.''

■ Siguiendo la trayectoria de la vida viajera de Lokpez, tenemos que de Venezuela él trasladó su domicilio a Haití donde desempeñó el cargo de *Attaché d'Affaires* de Cuba, pero en el año 1932 se trasladó a Puerto Rico, donde contrajo nuevas nupcias, y aquí continuó viviendo hasta fines de 1934, habiendo enviado a la demandante a New York a continuar sus estudios. Es cierto que le dijo a ella que él se iría a New York a vivir permanentemente, pero los hechos probados no demuestran que cumpliera este propósito. ''Para la adquisición de un domicilio por elección la *intención* de constituir un hogar debe ser una intención de constituirlo *en ese momento y no en el futuro*'', Restatement, Conflict of the Laws, Sec. 20, siendo éste el mismo concepto estatutario del domicilio del Artículo 11 de nuestro Código Político que dispone, en lo pertinente, que:

''Artículo 11. Toda persona tiene domicilio legal. Para determinar el lugar del domicilio se observarán las siguientes reglas:

''1. Es el lugar donde reside habitualmente una persona, cuando no es llamada a otra parte para trabajar u otro objeto temporal, y al cual retorna en las épocas de descanso.

''2. Sólo puede haber un domicilio.

''3. Para los efectos de la competencia de los tribunales, no puede perderse un domicilio hasta no adquirirse otro.

''4. Es domicilio de los hijos no emancipados el domicilio de su padre, y después de la muerte de éste, el de su madre.

''5. * * * * * * *

''6. * * . * * * * *

''7. El domicilio puede cambiarse sólo mediante *la unión del acto y del intento*.'' (Bastardillas nuestras.)

■ El hecho de que, según la demandante, en San Juan su padre residía en un ''boarding house'' no es óbice para que aquí tuviera su domicilio. En los comentarios que se hacen en el Restatement, Conflict of the Laws a la sección 13 que

define el hogar de una persona como el "sitio donde vive (dwelling place)", se dice que "ningún tiempo definitivo que se permanezca en un sitio es esencial para que dicho sitio sea un hogar." Y se pone como ejemplo el siguiente: "*A* vive continuamente en hoteles y permanece cada año nueve meses en un hotel en el estado *X*, siempre ocupando el mismo cuarto. Estos hechos son compatibles con que el cuarto sea su hogar."

Hace sólo poco más de un mes, el 21 de diciembre de 1943, que la Corte Suprema de los Estados Unidos resolvió en el caso de *Williams et al.* v. *The State of North Carolina*, que el requisito de un estatuto de Nevada de residencia en dicho Estado por el demandante durante seis semanas para poder presentar una demanda de divorcio equivale a "requerirle tener un domicilio" y no una mera residencia en el Estado, y en dicho caso se probó que la parte había residido en lo que se llamó "Alamo Auto Court", una especie de campamento de turistas. En una nota a la opinión de la mayoría de la corte escrita por el Juez Asociado Sr. Douglas, se dice:

"El hecho de que la permanencia en un Estado no sea larga no es necesariamente fatal a la existencia de un domicilio. Como se dijo en *Williamson* v. *Osenton*, 232 U. S. 619, 624, el 'hecho esencial que conlleva el cambio de residencia a un cambio en el domicilio es la ausencia de cualquier intención de vivir en otra parte.' La intención de permanecer por algún tiempo a la cual la persona 'no contemplaba entonces una terminación', se sostuvo que era suficiente." Véase además, *District of Columbia* v. *Murphy*, 314 U. S. 441.

La declaración de la demandante demuestra que su padre tenía su domicilio en San Juan, no sólo durante el año 1934 sino que continuó teniéndolo durante los años 1935 y 1936. En este último año el padre de la demandante al tener necesidad de hacer una petición de pasaporte para ella ir con él a Europa, no la hace en la ciudad de New York, sino que la trae a San Juan y aquí ella personalmente hace constar que su residencia permanente es en Santurce y luego,

en el pasaporte mismo, que la de su padre también es en Santurce, P. R. Por último la demandante declaró que era desde Puerto Rico que su padre, después de regresar de Europa, hacía viajes a Méjico y a New York.

Somos de opinión que toda la prueba demuestra que Lokpez desde fines del año 1932 hasta una fecha posterior al año 1936 tuvo su domicilio en San Juan, P. R., y que siendo la demandante menor de edad para esas fechas su domicilio era el de su padre, quien por tanto ejercía la patria potestad sobre su hija. Por consiguiente, la Corte de Distrito de San Juan tenía jurisdicción para conocer del caso sobre venta del solar de la demandante por motivos de utilidad y necesidad. Artículo 159, Código Civil (Ed. 193).

■■ Pasamos ahora a considerar si la resolución dictada por la Corte de Distrito de San Juan en el expediente sobre utilidad y necesidad autorizando la venta en pública subasta del solar propiedad de la aquí demandante es nula por alguno de los motivos alegados en la demanda en este caso y que ya hemos transcrito anteriormente. La corte inferior resolvió que dichos motivos constituían errores o irregularidades y que siendo la presente acción un ataque colateral a la resolución dictada solamente podía prosperar si se hubiera demostrado que la resolución era nula por haber actuado la corte inferior sin jurisdicción en el mencionado caso.

La apelante acepta el hecho de que la presente acción constituye un ataque colateral pero sostiene que demostró que dicha resolución es nula por haber actuado la corte sin jurisdicción y que por tanto debió declararse con lugar la demanda. Planteado así el debate veamos cuándo es que se puede, en el caso de una venta judicial, considerar que la corte actuó sin jurisdicción para autorizarla, y si el hecho de que dicha venta se refiere a bienes de menores varía la doctrina general.

No tenemos duda de que la regla expuesta por la corte inferior es correcta, 34 C. J. 511, sección 815; 31 Am. Jur.,

*Judgments,* sección 576, y 31 Am. Jur., *Judicial Sales,* sección 235, donde se dice que: "Por analogía a las reglas aplicables a ataques colaterales a las sentencias, está establecido que una venta judicial puede ser atacada colateralmente si es nula, pero que no lo puede ser por meros errores o irregularidades."

Sin embargo, las cortes de distrito al intervenir en los expedientes de utilidad y necesidad actúan no bajo su jurisdicción general sino como cortes de autoridad limitada y especial y la Corte Suprema de Estados Unidos ha resuelto, entre otros, en el caso de *Comstock* v. *Crawford,* 70 U. S. 396, 403, que: "está bien establecido que cuando la jurisdicción de una corte de autoridad limitada y especial aparece de la faz de los *procedimientos,* su acción no puede ser atacada colateralmente debido a meros errores o irregularidades. Si la jurisdicción aparece, la misma presunción de ley surge de que fué debidamente ejercitada que la que prevalece con referencia a la acción de una corte de superior y general autoridad".

Ahora bien, la misma Corte Suprema Federal en el caso de *Galpin* v. *Page,* 85 U. S. 350, 366, después de ratificar la regla antes mencionada, limita el alcance de la presunción a que se ha hecho referencia, en la forma siguiente:

"Pero las presunciones, que la ley implica en apoyo de las sentencias de cortes superiores de jurisdicción general, sólo surgen en relación con hechos jurisdiccionales sobre los cuales el récord está silencioso. Las presunciones sólo pueden prevalecer para suplir la ausencia de prueba o de alegaciones en relación con los hechos presumidos. No ha lugar a considerarlas cuando la prueba es demostrada o la alegación hecha. Cuando, por lo tanto, el récord contiene la prueba o una alegación en relación con el *hecho jurisdiccional,* se entenderá que dice la verdad sobre dicho punto, y no se presumirá que hubo otra o distinta prueba respecto al hecho, o que el hecho fué otro que el alegado." (Bastardillas nuestras.)

Al mismo efecto, véase *Old Wayne Life Association* v. *McDonough,* 204 U. S. 8.

¿Se cumplió por la corte inferior en el expediente de utilidad y necesidad con los requisitos exigidos por el art. 159 del Código Civil y la Ley de Procedimientos Legales Especiales en tal forma que pueda sostenerse que adquirió jurisdicción y que la venta judicial es válida? Veamos los hechos.

El cuadro que presenta todo lo ocurrido aparece del mismo récord de dicho expediente de utilidad y necesidad presentado como prueba en este caso.

Es el caso civil núm. 21429, Víctor L. Lokpez, peticionario, *ex parte,* sobre necesidad y utilidad. No se limita a contener la petición y la resolución de la corte, sino que contiene además la transcripción de la evidencia que sirvió de base para dictar dicha resolución. En la petición, radicada el 13 de agosto de 1934, se alega que Lokpez es mayor de 21 años, propietario, casado y vecino de San Juan y que comparece en concepto de padre en ejercicio de la patria potestad de la menor de edad, no emancipada, Georgina Luisa Lokpez Finlay, escolar, de su misma vecindad; que dicha menor es dueña de 15,000 metros cuadrados de terrenos en Santurce que adquirió por herencia de su señora madre y que de esa finca forma parte un solar de 360.40 metros cuadrados que se describe; que la finca la tiene dedicada la menor a la formación y venta de solares, habiéndola urbanizado, sin que produzca cantidad alguna en concepto de frutos naturales o civiles, y que el solar descrito ha sido solicitado por Angel Fernández por el precio de $1802; que "la utilidad y necesidad de la operación de venta se deriva de la finalidad propia de la urbanización y de la falta de numerario para atender la administración de otros bienes de la menor y sus gastos personales"; y termina solicitando se autorice la enajenación del solar, por el precio mínimo expresado (sic), en subasta pública, consignándose el precio obtenido en la corte para disponer del mismo de acuerdo con ulteriores órdenes judiciales. Esta petición fué notificada al fiscal.

Después de la petición aparece en el récord del caso 21429 la transcripción de la evidencia de la vista celebrada en la corte inferior el día 17 de agosto de 1934, o sea cuatro días después de radicada la petición. ¿Qué demuestra dicha transcripción? Para contestar esta pregunta se hace necesario, no obstante que por ello se haga más extensa esta opinión, transcribir aquí gran parte de ella con la aclaración de que las bastardillas son nuestras. Comienza así:

"El día 17 de agosto de 1934, se llamó este caso para la práctica de la prueba, *compareciendo el peticionario en propia persona y por su abogado Lic. Celestino Benítez.*

"Abogado.—*La prueba en el caso civil número 21249,* de Víctor L. Lókpez, sobre Autorización Judicial, *será idéntica a la del caso núm. 21456, que vamos a ver,* haciéndose constar que las dimensiones del solar en el caso *21429* quedarán enmendadas en la siguiente forma: (se describe).

"Juez.—Puede presentar la prueba.

"Abogado.—Presentamos como prueba el pleito núm. 20516, en el cual aparece la escritura que lleva el número 445, de 1 de diciembre de 1919, ante el Notario Damián Monserrat, en la cual se adjudicó a la menor Georgina Luisa Lókpez Finlay, por la suma de $23,750 una finca en el barrio Santurce Sur, compuesta de 15 mil metros cuadrados de terreno, y aparece en el mismo expediente el recibo de contribuciones sobre la propiedad, de la cual forma parte el solar objeto de este expediente.

"*Prueba testifical del peticionario.* Declaración de Víctor Luis Lókpez.

"P.—¿Cómo se llama usted? R.—Víctor Luis Lókpez.

"P.—¿Dónde vive? R.—En Santurce.

"P.—¿Qué parentesco tiene usted con Georgina Luisa Lókpez Finlay? R.—Padre.

"P.—¿Cuál es la edad de esta niña? R.—17 años cumplidos.

"P.—¿Dónde reside actualmente ella? R.—En New York.

"P.—¿Qué hace en New York? R.—Estudiando.

"P.—¿Georgina Luisa Lókpez Finlay es dueña de alguna propiedad en la municipalidad de San Juan? R.—Sí, señor, en el barrio Santurce, parada 23.

"P.—¿Entre esas propiedades se encuentra la de *quince mil metros cuadrados?* R.—Sí, señor.

"P.—¿A qué se destina esa propiedad? R.—A urbanización.

"P.—¿Está dividida en solares? R.—En distintos solares.

"P.—¿*Qué cabida tiene el solar objeto de esta solicitud?* R.—*726 metros cuadrados con 30 céntimos.* (Continúa describiendo este solar de 726.30 mc.)

"P.—¿Qué valor aproximado tendrá *ese solar?* R.—*Cinco mil pesos.*

"P.—¿Hay personas interesadas en su adquisición? R.—Hay varias personas.

"P.—¿Actualmente produce alguna renta? R.—Muy poca renta.

"P.—¿Qué renta produce? R.—20 pesos.

"P.—¿Usted cree que es útil y ventajoso para la menor la venta del solar? R.—Sí, señor.

"P.—¿Por qué? R.—Porque *con ello se cancelarán ciertas cargas que tiene la finca y el resto se colocaría a interés para renta.*

"P.—¿*Este solar* está afecto a alguna carga? R.—No señor.

"P.—¿Esas cargas a que se refiere son de otras propiedades de la menor? R.—Sí, señor.

"P.—¿Qué cargas tiene? R.—*Cuatro mil pesos.*

"P.—¿Entonces cree que el éxito del valor que adquiriera la propiedad es venderla en solares y es beneficioso para la menor? R.—Sí señor.

"P.—¿Hay alguna persona interesada en la adquisición del solar? R.—Sí, señor, *Juan Hernández.*

"P.—¿*Actual arrendatario del solar?* R.—Sí, señor.

"P.—¿Cuánto le ha ofrecido por él? R.—*Cinco mil pesos.*

"P.—¿En qué condiciones de pago? R.—Cuatro mil pesos y mil pesos pagados en 90 días con el 9 por ciento de interés.

"P.—¿Cuatro mil pesos en el acto de la venta?— R.—Sí, señor, y mil pesos a los tres meses con interés al 9 por ciento.

"P.—Nada más.

"Juez.—Únanse las notas taquigráficas al expediente *y pase a informe del fiscal.*"

Esta transcripción está certificada por el taquígrafo como copia fiel y exacta de lo actuado en la vista del caso, el 18 de agosto de 1934. Al calce de la misma hay una nota, sin fecha, que dice:

"Manuscrito: No me opongo. (Fdo.) M. Romany, Fiscal."

Aparece luego en el récord la resolución dictada por la corte en la que hace constar que "Vista la solicitud jurada

de Víctor Luis Lokpez Domenech. . . ; *examinada la prueba aportada para demostrar las alegaciones de dicha solicitud y oído* el dictamen del Fiscal . . . declara justificada por la información de ser útil y necesario para la menor . . . la venta por precio de cinco dólares por metro de superficie" el solar de "trescientos sesenta y cinco metros dos decímetros cuadrados", y ordenó al márshal dicha venta en subasta pública por el expresado precio mínimo y que depositara el precio obtenido en la secretaría para disponerse del mismo de acuerdo con ulteriores órdenes judiciales.

Sigue el mandamiento expedido por el secretario al márshal y el certificado de diligenciamiento de éste al efecto de que lo cumplimentó el 21 de septiembre de 1934 y a continuación aparece el edicto publicado por el márshal en la tablilla de edictos de la corte y en el periódico "El Imparcial"; declaración jurada del administrador de este periódico de que se publicaron los edictos, y por último termina el expediente con el Acta de Subasta celebrada por el márshal de la que aparece que Angel Fernández Vidal fué el único postor que ofreció el precio mínimo señalado y a quien se le otorgó la buena pro, habiendo acto seguido satisfecho el precio de adquisición, $1825.50 que fueron depositados en la secretaría de la corte.

Si comparamos los hechos alegados en la petición en el caso 21429, supra, con los requisitos exigidos en los artículos 80 y 81 de la Ley de Procedimientos Legales Especiales (Arts. 614 y 615 del Código de Enjuiciamiento Civil), veremos que no se cumplieron los siguientes:

1. No se alegó la edad de la menor; (Art. 80)

2. No se alegaron los nombres y residencias de sus más próximos parientes dentro de los grados señalados o el hecho de que no los tuviera; (Art. 80)

3. No se presentó prueba en relación con la necesidad y utilidad para la menor de la venta del solar especificado en la petición ni de su valor para poder fijar el tipo mínimo en la subasta (Art. 81).

4. No asistió a la vista el fiscal ni rindió informe escrito alguno (Art. 81) en relación con el solar cuya venta específicamente estaba envuelta en el caso 21429, supra;

5. La única prueba documental presentada en el mencionado caso fué la escritura relacionada con la adquisición por la menor de la totalidad de la finca que heredó y, por tanto, no se presentó prueba documental sobre la demostración de la patria potestad del peticionario (Art. 81);

6. No habiéndose alegado en la solicitud los nombres de los parientes más próximos de la menor, o el hecho de que no los tuviera, no tuvo el juez base alguna para ejercitar su discreción de hacerlos comparecer para ser examinados (Art. 81).

Las anteriores conclusiones en tanto en cuanto se refieren a la solicitud no requieren más explicación para comprobarlas que una lectura de la misma. Las que se refieren a la prueba sí la requieren ya que parece ilógico sostener que no se practicó prueba cuando existe en el expediente una transcripción de evidencia. Pero es que la prueba allí transcrita se refiere a otro caso que para la misma fecha se estaba tramitando en la corte inferior, o sea el número 21456, también sobre necesidad y utilidad para la venta de otro solar distinto de la menor apelante. Al llamarse el caso 21429 el abogado del peticionario hizo constar que la prueba sería "idéntica a la del caso núm. 21456, que vamos a ver", y dijo que las dimensiones del solar quedarían enmendadas en la forma que especificó, aumentando su cabida en 4.62 m/c. El peticionario procedió entonces a declarar primero, en relación con el hecho de ser padre de la menor, que él residía en Santurce, que ella tenía 17 años y residía en New York donde estaba estudiando y, segundo, en relación con el solar objeto del caso 21456, que era uno de 726.30 m/c, cuyo valor era de $5000, que producía $20 de renta; que el mismo era interesado por el arrendatario Juan Hernández por dicho precio a ser pagado $4000 en el acto de la venta y $1000 a los noventa días con intereses al 9 por ciento. Dicha única

declaración no contiene ni una *scintilla* de prueba que se refiera ni remotamente al solar objeto de la venta solicitada en el caso *21429* que era uno de *360.40* m/c que había sido solicitado en compra por el aquí demandado Angel Fernández por $1802.

El único resultado a que se pudo llegar entonces y puede llegarse ahora es que no habiéndose presentado la prueba necesaria en el caso *21429,* en relación con el solar de 360.40 m/c, no hay base alguna tampoco para sostener que la resolución dictada lo fué de acuerdo con "la prueba aportada para demostrar las alegaciones de dicha solicitud y oído el dictamen del fiscal", según dijo la corte inferior. Ni hubo prueba ni fué oído el fiscal, pues el "No me opongo" puesto por dicho funcionario al pie de la transcripción tuvo que referirse necesariamente a lo que dicha transcripción contenía o sea la prueba en cuanto a otro solar distinto.

¿Pueden considerarse los anteriormente expuestos meros errores e irregularidades que no vician de nulidad todo este procedimiento? ¿Son "hechos jurisdiccionales" los que se dejaron de cumplir y aparecen del récord para que no deban prevalecer las presunciones que la ley implica en favor de toda sentencia, según lo resuelto en el caso de *Galpin* v. *Page,* supra?

En el caso de *Abraham* v. *Homer,* 226 Pac. 45, 47, se determina claramente cuáles son los *hechos jurisdiccionales* cuya omisión pueden afectar la validez de una sentencia en un procedimiento de la naturaleza del que estamos considerando, diciéndose: "Jurisdicción sobre la persona, jurisdicción sobre la materia en controversia y jurisdicción para rendir la sentencia específica, son tres elementos separados de la jurisdicción de una corte. Cada elemento de jurisdicdicción depende tanto de la ley cómo de los hechos. Los hechos que demuestran que el emplazamiento se hizo en tiempo, forma y manera suficiente para cumplir con los requisitos de estatutos mandatorios son esenciales en cuanto a la *jurisdicción sobre la persona.* Hechos que demuestran que la ma-

teria envuelta en el caso constituye la materia consignada por ley a la jurisdicción de la corte son esenciales a la *jurisdicción sobre la materia del pleito. Hechos que demuestran una sentencia en particular dictada de acuerdo con las disposiciones mandatorias de la ley a ese respecto, son esenciales a la jurisdicción para rendir la sentencia en particular. Todos esos hechos se conocen como hechos jurisdiccionales.* (Citas).'' (Bastardillas nuestras.)

Siguiendo esta pauta resolvemos (1) que Lokpez por tener su domicilio en Puerto Rico tenía la patria potestad sobre su hija y que al comparecer en dicho carácter en el expediente, la corte inferior adquirió jurisdicción sobre la persona de la menor, cumpliéndose así con el primer hecho jurisdiccional o sea jurisdicción sobre la persona y (2) que tratándose de la venta de bienes inmuebles de un menor, situados en Santurce, la Corte de Distrito de San Juan era la llamada, de acuerdo con la ley, a intervenir en el expediente, quedando demostrado así el segundo hecho jurisdiccional, o sea, jurisdicción sobre la materia.

Fáltanos por resolver si existe en la resolución dictada en el expediente de. utilidad y necesidad el tercer hecho jurisdiccional, es decir, si las disposiciones de la Ley de Procedimientos Legales Especiales son o no mandatorias en tal forma que su incumplimiento conlleva necesariamente la nulidad de la resolución. Usamos la palabra ''necesariamente'' porque es la que a su vez se usa en el *Restatement, Judgments,* Sec. 8, cuando al tratar sobre los requisitos para la validez de una sentencia, se dice:

''Una sentencia es *nula* si hay una ausencia de cumplimiento con los requisitos que son *necesarios para el ejercicio del poder de la corte.*'' (Bastardillas nuestras.)

Expuesto en una forma más concisa esto constituye el tercer hecho jurisdiccional antes mencionado. En el caso de *Abraham* v. *Homer,* supra, se hace un estudio extenso sobre la distinción que debe hacerse en estos casos entre *hechos*

*jurisdiccionales* y *hechos cuasi jurisdiccionales.* Esa distinción es de suma importancia en la solución del problema legal planteado especialmente en un caso de ataque colateral, como el de autos, en el cual no se ha alegado ni probado elemento alguno de fraude. Se dice por la corte en aquel caso que después que una corte ha adquirido jurisdicción sobre la persona y la materia, hay ciertos pasos a seguir que constituyen "un método de procedimiento (a course of procedure); que si los legisladores al proveer dichos pasos tuvieron en mente solamente una forma aconsejable para seguir ordenamente adelante y no tenían en mente la naturaleza de la sentencia a dictarse, entonces la ley debe considerarse directiva y dichos pasos no se tomarán en cuenta al determinar el poder judicial de la corte para rendir la sentencia. Hechos que demuestran el cumplimiento con esa ley son claramente cuasi jurisdiccionales y no deben considerarse en un ataque colateral. De otra parte, si aparece que en la aprobación de esa ley los legisladores al proveer un paso en el procedimiento tuvieron en mente el efecto que dicho paso podría tener en la sentencia que posteriormente había de dictarse y tuvieron la intención de que dicho paso en el procedimiento fuera una condición previa a la existencia del poder judicial de una corte para rendir posteriormente la sentencia en particular, entonces esos hechos, aunque en cierto sentido son cuasi jurisdiccionales son claramente hechos jurisdiccionales necesarios a la existencia del tercer elemento de jurisdicción . . . . El cumplir con el estatuto mandatorio . . . alcanza o va al poder de la corte para dictar la sentencia y el resultado de dicho cumplimiento se adhiere a la sentencia como parte material y substancial de la sentencia misma."

Como un ejemplo del tercer hecho jurisdiccional se expone el siguiente: "cuando el estatuto requiere que el solar a ser vendido debe ser tasado y que la corte no confirmará su venta por menos de un tanto por ciento determinado de la tasación, entonces dicha tasación, aunque un paso en el

procedimiento, crea un resultado que es inherente a la substancia material de la sentencia. Los hechos que demuestren un cumplimiento con dicho estatuto mandatorio son materiales a la existencia del poder de la corte para rendir la sentencia confirmando la venta y son hechos jurisdiccionales.''

Específicamente se resolvió en el caso de *Abraham* v. *Homer,* supra, que en un ataque colateral, el ordenar la sentencia la venta de bienes de un menor, los hechos que demuestran *cómo se invirtió el producto de dicha venta,* no son hechos jurisdiccionales ni cuasi jurisdiccionales sino que se refieren a la existencia de una causa de acción para dicha venta, no siendo material a la jurisdicción de la corte que una causa de acción fuera alegada o probada en cuanto a dicha inversión.

Para la venta o gravamen de bienes inmuebles de un menor dispone el artículo 159 del Código Civil que el padre sólo puede hacerlo ''previa autorización'' de la corte de distrito y ''previa *comprobación* de la utilidad y necesidad para el menor'', de acuerdo con la Ley de Procedimientos Legales Especiales. De todos los errores e irregularidades cometidos en la tramitación del expediente 21429 supra, hay uno que a nuestro juicio conlleva la nulidad de la resolución dictada y es el que se refiere a no haberse presentado prueba alguna sobre el valor de dicho solar y la utilidad y necesidad de la venta solicitada. No hubo ''previa comprobación'' de clase alguna, según exige el Código Civil, ni se cumplió con la Ley de Procedimientos Legales Especiales al efecto. No importa lo que otros tribunales hayan resuelto en cuanto a la validez de una sentencia, especialmente en casos contenciosos, dictada sin practicarse prueba o con prueba insuficiente. En Puerto Rico no puede ordenarse la venta de bienes de un menor sin que previamente se compruebe la utilidad y necesidad para él de dicha venta. Es ese un paso previo de carácter mandatorio que la legislatura tuvo en mente que debe cumplirse por las cortes de distrito en estos casos.

Es un requisito necesario para el ejercicio del poder de la corte. La cuestión no es nueva en esta jurisdicción. Ya esta Corte Suprema desde el año 1922 al resolver en el caso de *González* v. *Roig et al.,* 31 D.P.R. 35, que si bien las cortes no deben aceptar *affidavits* como prueba en los expedientes de utilidad y necesidad no podía decirse que no había prueba en un caso en que se admitieron, y se dijo por voz del Juez Presidente Sr. del Toro, a la página 38, lo siguiente:

"Este último extremo es el único dudoso en este caso. *A nuestro juicio ni antes ni ahora podía ni puede concederse por una corte autorización para vender o gravar bienes de menores sin prueba de la necesidad o utilidad de la transacción. La sola solicitud, no obstante estar jurada, no es suficiente. Se necesita algo más.* ¿Existió ese algo más en este caso? A nuestro juicio existió, aunque en una forma poco recomendable. Las cortes no deben aceptar meros affidavits en casos de esta naturaleza. *Los testigos deben comparecer personalmente y ser interrogados ante la corte y por la corte si ésta lo estimare necesario.*" (Bastardillas nuestras.)

En este caso el Juez Asociado Sr. Wolf disintió por ser de opinión que la sentencia debió ser revocada por entender que los affidavits no constituían prueba en un caso de esta naturaleza. Comentando el artículo 82 de la Ley de Procedimientos Legales Especiales según leía entonces al efecto de que "la corte admitirá y practicará las pruebas que se le ofrezcan sobre la utilidad y necesidad etc.", se expresó así:

"Si es meramente una mala práctica, como se consigna en la opinión de la mayoría, presentar affidavits en la venta de propiedad de menores y no es contraria a la ley, entonces las partes y los abogados tienen derecho en proceder a presentar affidavits no obstante la advertencia de esta corte. La idea que tengo es que la letra y espíritu de la ley es de otro modo. 'Admitirá y practicará pruebas' quiere decir que la corte *considerará pruebas.* 'Pruebas,' sostengo que debe ser traducida por 'evidencia' (evidence). . . . . .

"En cuanto al espíritu de la ley o su verdadera intención éste fué un procedimiento para disponer de la propiedad de un menor. No se asemeja a un injunction preliminar donde las partes tienen otra vista. Es una disposición definitiva de la propiedad y *la corte*

*debe tener la oportunidad de oír prueba y examinar testigos en interés de las personas non sui juris. La corte es una protectora."* (Bastardillas nuestras.)

El artículo 81 de la ley, según rige actualmente (artículo 615 del Código de Enjuiciamiento Civil) es tan específico o más que el artículo 82 anterior pues dispone, en lo pertinente, que:

"Artículo 615. (81 L.)—Presentada *en forma* la solicitud, la corte señalará día para la práctica de las pruebas *relativas a los hechos alegados,* debiendo el acto verificarse en corte abierta, o en el despacho del juez, si la corte estuviere en vacaciones, *con asistencia del fiscal de distrito, que intervendrá en el asunto para la vigilancia de los derechos del menor o incapaz.*

"*Las pruebas documentales deberán comprender la demostración de la patria potestad* o de la tutela, y, si la autorización versase sobre bienes inmuebles, *los títulos de propiedad y la tasación de los bienes a los efectos del pago de contribuciones, si estuvieren sujetos a ellas.*

" * * * * * * * *

"*Practicadas éstas,* el juez concederá o negará la autorización pedida, *de acuerdo con el resultado de las pruebas,* y la resolución será apelable por el solicitante o por el fiscal, para ante el Tribunal Supremo de Puerto Rico." (Bastardillas nuestras.)

Somos de opinión que la previa comprobación de la necesidad y utilidad que exige el artículo 159 del Código Civil no puede realizarse por la corte a menos que se practique la prueba relativa a los hechos alegados debiendo comprender la documental la demostración de la patria potestad.

 Que el menor de edad no está impedido de atacar la prueba presentada en un expediente de utilidad y necesidad lo resolvimos en *F. Zayas, S. en C.* v. *Torres,* 51 D.P.R. 796, 803, donde el Juez Asociado Sr. Travieso hablando por la Corte dijo:

"La corte inferior erró al considerar *como prueba concluyente de la reclamación la sentencia dictada ex parte en el expediente de utilidad y necesidad.* Los menores demandados *no están impedidos en manera alguna para atacar la suficiencia de la prueba que sirvió de base a dicha sentencia.* Y esa prueba era a nuestro juicio clara-

mente insuficiente para sostener la reclamación de la demandante como una obligación exigible a los menores aquí demandados.'' (Bastardillas nuestras.)

Anteriormente en este caso se había dicho que:

''. . . El legislador ha impuesto a las cortes de distrito la obligación de investigar y convencerse de la necesidad y utilidad, para el menor, de los actos o contratos que han de celebrarse en su nombre, *antes de que dichas cortes puedan ejercitar la facultad que la misma ley les confiere para autorizar tales actos o contratos.* Véanse artículos 614 a 616 del Código de Enjuiciamiento Civil (1933). . . .'' (Bastardillas nuestras.)

*Cf. Valentín Valle v. Registrador,* 61 D.P.R. 218.

En el caso de autos, como hemos visto, se trató de consolidar la vista de los casos 21429 y 21456; empero, eliminando la declaración de Lokpez en cuanto a las circunstancias personales suyas y de su hija, no hubo prueba alguna ante la corte en relación con el caso 21429 para que pudiera determinarse el valor del solar, el precio mínimo a fijarse para su venta y la necesidad y utilidad de la misma para la menor. El precio mínimo de $5 el metro cuadrado fijado en la resolución no está ni alegado en la petición ni hubo prueba que lo justificara. La prueba toda se refiere al solar del caso 21456 valorado en $5000.

Deseamos que se entienda bien el alcance de nuestra decisión de este caso. Si en el expediente 21429 se hubiera presentado cualquier clase de prueba, suficiente o no, para sostener la utilidad y necesidad de la venta del solar por el precio mínimo de $5 el metro cuadrado, no podría atacarse colateralmente la resolución dictada ni entraríamos a considerar la suficiencia de dicha prueba. Lo que resolvemos es que, en un caso como el de autos en que no se presentó prueba de clase alguna para determinar dicha utilidad y necesidad y ese hecho aparece de la faz de los procedimientos, la resolución puede ser atacada colateral o directamente por haber sido dictada en violación de la ley.

 Si se admitiera la validez de una resolución dictada en esta forma sería hacer caso omiso de las disposiciones mandatorias de nuestro Código Civil. Basta unir a este defecto jurisdiccional los demás errores cometidos para darnos cuenta de la negligencia crasa con que la corte inferior ha venido actuando en estos expedientes. La defensa de la santidad de las sentencias por que clama dicha corte en su opinión, no debe extenderse a una resolución dictada ex parte, sin alegaciones suficientes y necesarias en la petición, sin prueba para sostener aquellas que se formularon y sin asistencia ni informe válido del fiscal. Cuando al error fundamental ya apuntado se reúnen en un solo caso todos los demás errores e irregularidades que hemos especificado, no se debe pretender cubrirlos con el palio de santidad y firmeza de una resolución válida. En cuanto a los demás errores diremos que si bien en el caso de *Caballero* v. *Registrador,* 35 D.P.R. 617, esta corte dijo que "el especificar la edad del menor o de los menores especificados en una partición es un requisito previo jurisdiccional", también se hizo constar que no aparecía comprobada la edad en el resto del expediente. En el caso presente en la vista del expediente el padre declaró que la menor tenía 17 años y que residía en New York, hecho que la propia demandante ratificó en el juicio, no siendo obligatoria su comprobación de acuerdo con el artículo 81 de la ley. Tampoco es un error que afecte la jurisdicción el no haberse alegado el nombre de los parientes de la menor, pues siendo discrecional en la corte el citarlos no puede considerarse como un requisito mandatorio.

 Que la asistencia del fiscal a las vistas en estos casos no es un mero formalismo se dijo en el caso de *Amy Ramú* v. *Sucn. Verges,* 37 D.P.R. 49, 63, donde después de citarse los artículos 80 y 81, supra, aparece lo siguiente:

"El fin obvio de estas disposiciones más recientes no fué meramente restablecer las reglas prescritas por las leyes en vigor al tiempo de adoptarse nuestro Código de Enjuiciamiento Civil actual y suplir las omisiones del mismo, sino también para proveer *protección adi-*

*cional para los derechos de los menores, confiriendo a la corte y a los fiscales poderes que no tenían, e imponiéndoles deberes y responsabilidades que no existían bajo el Código Civil español y su sistema de procedimiento. De lo contrario, no habría necesidad, ni podría darse una explicación satisfactoria, de la modificación hecha en tales leyes, y el hecho de esa modificación es por sí mismo evidente.*

"El efecto de estos cambios en lo que al dominio de la corte sobre el ejercicio de la patria potestad se refiere, ha sido reducir la autoridad paterna al mismo nivel general que *la de un tutor o defensor.*" (Bastardillas nuestras.)

Con anterioridad al año 1911 cuando fué enmendado el artículo 81, supra, la Ley de Procedimientos Legales Especiales sólo requería la "audiencia" del fiscal y esta Corte resolvió en varios casos que no era un requisito a cumplir el que dicho funcionario asistiera personalmente e interviniera en las vistas de los expedientes de necesidad y utilidad. Empero, bien claro se hizo constar en el caso de Amy Ramú, supra, que la enmienda a la ley había impuesto nuevos deberes y responsabilidades, tanto a la corte como al fiscal, que debían ser cumplidos so pena de que la ley y la intención legislativa fueran consideradas como letra muerta. La importancia que para la debida protección de los intereses del menor tiene esta enmienda la demuestra palpablemente el caso de autos. De haber asistido el fiscal a la vista del caso 21429 no hubiera podido pasar desapercibido el hecho de que no se había presentado prueba alguna justificativa de la venta solicitada. La excusa de que en la corte inferior ha prevalecido la práctica de que el fiscal nunca asista a la vista de esos casos limitándose a informar por escrito de acuerdo con la transcripción de evidencia, podría prevalecer por excepción y en defensa y protección de las resoluciones recaídas en aquellos casos en que el expediente demostrase que se practicó prueba para sostener los hechos alegados en la petición constitutivos de la necesidad y utilidad de la autorización solicitada. Aunque merecería y obtendría nuestra censura, siendo un error aislado, dicha omisión no sería suficiente para que pudiera prosperar una acción de nulidad.

Decimos esto en contestación al temor expresado por la corte inferior de que si la presente acción prosperara podrían anularse miles de casos en los que los fiscales de dicha corte, siguiendo la costumbre y práctica establecidas no han comparecido a las vistas. De hecho puede demostrarse que la intervención del fiscal fué eficaz aunque no asistiera a la vista. Entre la prueba presentada en este caso está el expediente número *20516* del aquí peticionario solicitando la venta de otro solar de la menor al que se le fijaba un precio mínimo de $6 el metro cuadrado. Practicada la prueba y pasado el expediente al fiscal este funcionario rindió un informe a virtud del cual solicitaba que se fijara un precio mínimo de $8 por metro cuadrado y la corte, seguramente que atendiendo a los méritos de dicho informe, al dictar su resolución fijó el precio mínimo recomendado por el fiscal para la venta. Y aún cuando en otros casos el fiscal no haya asistido a la vista y se haya limitado a rendir un informe no oponiéndose a la autorización por estar justificada por la prueba, existiendo dicha prueba en la transcripción, tampoco sería motivo suficiente de nulidad. Lo que sí resolvemos es que la práctica establecida en la Corte de Distrito de San Juan o en cualquiera otra corte, debe descontinuarse y que los fiscales están en la obligación de asistir a las vistas de estos casos y los jueces están en el deber de hacerles cumplir con dicha obligación.

Aún cuando la apelante señala otros motivos de nulidad además de los anteriormente discutidos, somos de opinión que refiriéndose los mismos a hechos que no constan del propio récord del expediente 21429, supra, el demandado no estaba obligado a investigarlos. El alcance de la actual decisión debe entenderse limitado al error fundamental resuelto, es decir, el no haberse por la corte de distrito comprobado previamente la necesidad y utilidad de la venta del solar, por no haber presentado prueba sobre la misma actuando por tanto sin jurisdicción y que un comprador en una venta judicial en estos casos no debe limitarse a examinar la orden

de venta cuando todos los procedimientos aparezcan del récord y en ellos los que sean necesarios para dejar establecida la jurisdicción de la corte.

La demandante también solicitó en su demanda que se condenara al demandado al pago de los frutos civiles producidos por el solar a razón de $300 anuales. La prueba presentada no demostró dichos frutos percibidos. Además, en una situación similar en el caso de *Solá* v. *Castro et al.*, 32 D.P.R. 804, se resolvió lo siguiente:

"Quedaba por resolver, la cuestión relativa a los frutos que en cantidad de $20,000 reclama la demandante de los demandados, pero un examen de la prueba aportada en este particular, no es bastante para determinar fijamente una estimación juiciosa de los frutos percibidos, y aunque además pudiéramos apreciarlos, no es éste el caso en que la reivindicación lleva como secuela la indemnización de frutos. Los demandados fueron compradores inocentes y si en esta acción un ataque colateral les ha hecho estéril su compra y trastorna sus negocios, la contingencia de una operación equivocada no les lleva a las más fatales consecuencias y en su buena fe la ley por otro lado los protege en cuanto a los frutos, por lo que no quedan obligados a su devolución, de acuerdo con lo que dispone el artículo 453 del Código Civil."

*Debe revocarse la sentencia apelada y dictarse otra declarando con lugar la demanda, con costas, sin incluir honorarios de abogado.*

EN MOCION DE RECONSIDERACION

RESOLUCIÓN

Abril 27, 1943.

Por la Corte, a propuesta del Juez Asociado Sr. Todd, Jr.

Vista la moción sobre reconsideración de sentencia radicada por la apelante, fundada, primero en no haber esta Corte condenado al demandado a pagar a la demandante los frutos civiles producidos por la finca objeto de reivindicación, y segundo, en haberse aplicado a los hechos de este caso la doctrina del domicilio;

560 

Por cuanto, el primer fundamento se argumenta alegando que el caso de *Solá* v. *Castro et al.*, 32 D.P.R. 804 citado en nuestra opinión no es aplicable pues allí no estuvieron envueltos los derechos de un menor de edad. Asumiendo, sin resolverlo, que ese sea el alcance del artículo 380 del Código Civil, en dicho caso aplicado, nuestra conclusión adversa a la apelante no descansa primordialmente en el referido caso sino, como hicimos constar expresamente, en que "La prueba presentada no demostró dichos frutos percibidos", y

Por cuanto, reexaminada detenidamente la segunda cuestión planteada somos de opinión que debemos ratificar la conclusión original,

Por tanto, se declara sin lugar la moción de reconsideración.