GREEN GIANT CO. y SAINT PAUL FIRE AND MARINE INSURANCE CO., peticionarias, *v.* TRIBUNAL SUPERIOR, SALA DE SAN JUAN, HON. HÉCTOR A. COLÓN CRUZ, JUEZ, demandado; JOSÉ MONGE CARRASQUILLO y EDUARDO ROSARIO, interventores.

*Número:* O-75-126    *Resuelto:* 19 de diciembre de 1975

490

*Goldman, Antonetti, Barreto, Curbelo & Dávila* y *Jorge L. Martínez,* abogados de las peticionarias; *Teresita Alicea Rivera, Salvador Tió, David Noriega Rodríguez* y *Rafael Ortiz Carrión,* abogados de los interventores.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

■ Debemos decidir en este recurso si la Sec. 16 del Art. II de la Constitución del Estado Libre Asociado y la legislación que establece la jornada legal de trabajo en Puerto

Rico, Ley Núm. 379 de 15 de mayo de 1948, 29 L.P.R.A. sec. 274 y sigs., se aplican a los contratos de los trabajadores migrantes que prestan servicios en labores agrícolas en los Estados Unidos.

Los interventores José Monge Carrasquillo y Eduardo Rosario suscribieron en Puerto Rico contratos de trabajo para los años 1972 y 1973 respectivamente, en virtud de los cuales ellos prestaron servicios a la peticionaria Green Giant Co. en los estados de Delaware y Maryland. Dichos contratos fueron aprobados por el Secretario del Trabajo de Puerto Rico a tenor con las disposiciones de la Ley Núm. 87 de 22 de junio de 1962, 29 L.P.R.A. sec. 526 y sigs., la cual regula la contratación de trabajadores puertorriqueños cuyos servicios hayan de utilizarse fuera de Puerto Rico.

Los interventores instaron demanda contra la peticionaria en el Tribunal de Distrito reclamando el pago de compensación extraordinaria por horas alegadamente trabajadas en Maryland y Delaware en exceso de la jornada legal, por el día de descanso y una suma adicional en concepto de penalidad. El Tribunal de Distrito denegó la desestimación de la demanda solicitada por Green Giant Co. y el Tribunal Superior confirmó dicha resolución sin expresar fundamentos.

La peticionaria nos pide la revocación de dicha resolución fundándose esencialmente en la inaplicabilidad de la Sec. 16 del Art. II de la Constitución y de la mencionada Ley Núm. 379 al contrato de trabajo, objeto de este caso, cuya consumación ocurre fuera de Puerto Rico.

La solución al planteamiento de la recurrente requiere que examinemos el contrato entre las partes, la ley que lo regula —Ley Núm. 87 *supra*—los propósitos que la animan, así como los alcances de la Ley Núm. 379 y de la garantía constitucional a compensación extraordinaria, Sec. 16 del Art. II de la Constitución.

El contrato de trabajo regula minuciosamente las rela-

ciones entre las partes proveyendo entre otras cosas las siguientes:

1. Los términos del empleo y reempleo. (Art. 2)

2. Garantía de trabajo semanal. (Art. 3)

3. Los períodos de paga y la fijación de un salario mínimo de $1.80 por hora o el tipo de salario prevaleciente en el área de empleo, cualquiera que sea mayor. (Art. 4C)

4. Conservación de récord sobre horas trabajadas, salarios, clase de cosecha, deducciones y dinero retenido del salario, disponiéndose una compensación adicional a lo adeudado, si el patrono dejare de mantener estos récords y resultara que no se pagó adecuadamente al trabajador. (Art. 4J)

5. Se fija una jornada de trabajo de ocho horas en cada día en que se proporcione trabajo y seis días en cada semana de trabajo, estipulándose que por mutuo acuerdo el trabajador podrá trabajar horas adicionales o un séptimo día en cualquier semana de trabajo. (Art. 5A)

6. Se prohíbe el discrimen contra el trabajador por motivo de raza, color, credo, afiliación o actividad en cualquier organización de trabajo; asumiendo el patrono responsabilidad hacia el trabajador por los mismos derechos, privilegios y condiciones brindadas a trabajadores industriales por sus patronos bajo las leyes de Compensaciones Obreras del estado en que ha estado empleado el trabajador; asumiendo, además, el patrono iguales responsabilidades cuando se requiere a los trabajadores vivir en casas proporcionadas por él. (Art. 5C)

7. Se impone la obligación al patrono de proporcionar al trabajador vivienda limpia, adecuada, higiénica, sin costo alguno para el trabajador, así como comidas adecuadas, etc. (Arts. 5A y 5B)

8. Regula las responsabilidades del trabajador. (Art. 7)

9. Reglamenta la transportación del trabajador desde el punto de partida en Puerto Rico hasta el lugar de empleo y regreso. (Art. 8)

10. Provee para el pago de un seguro grupal no ocupacional. (Art. 9)

11. Autoriza al Departamento del Trabajo a representar al trabajador en todo asunto que surja bajo el contrato, estableciendo la facultad del Departamento de cancelar el convenio cuando el patrono dejare de cumplir con el mismo. (Art. 10)

12. Estipula que el patrono se somete a la jurisdicción de los tribunales de Puerto Rico para todos los propósitos de enforzar el convenio, sin limitar el derecho del trabajador a iniciar acción legal en cualquier corte competente del estado del patrono. (Art. 11)

■ Lo primero que llama la atención de este contrato de trabajo es que, a pesar de la previsión de las partes en cubrir puntillosamente sus relaciones contractuales, no se proveyó para una cuestión tan importante como lo es la compensación extraordinaria. La omisión cobra mayor relieve y significación frente al hecho de que las partes estipularon específicamente una jornada de trabajo de ocho horas y su ampliación a horas adicionales por mutuo acuerdo. (Art. 5A.) Es decir, tuvieron presente la posibilidad de que se rindiese labor en exceso de la jornada acordada pero no dispusieron el pago de compensación extraordinaria.

La única expresión que hay en el contrato sobre el pago de compensación adicional se refiere al caso en que el patrono dejare de mantener los récords indicados en el convenio y se comprobara que el trabajador no fue pagado adecuadamente. (Artículo 4J.) Es lógico asumir que si la compensación adicional hubiere de ser aplicable, además, a horas extras, así se hubiera dispuesto.

■ Los demandantes alegan que le aplican los beneficios de la Ley Núm. 379, pero nótese que el propio texto de dicha ley restringe su ámbito de operación al trabajo realizado en Puerto Rico. La Exposición de Motivos es clara al respecto:

"Es la política de esta ley limitar a un máximo de ocho horas la jornada legal de trabajo *en* Puerto Rico y proveer el pago de un tipo doble de salario para las horas trabajadas en exceso de la jornada legal." (29 L.P.R.A. sec. 271. (Énfasis suplido.)

■ En cuanto a la Ley Núm. 87, *supra,* que autoriza la intervención del Secretario del Trabajo en la negociación del contrato de trabajo, es conveniente señalar que dicha ley no incluye el pago de compensación extraordinaria. Un examen

de su historial legislativo no revela intención al respecto. Los interventores, sin embargo, sostienen que el historial legislativo da base para deducir la intención de que la Ley Núm. 379 y la Sec. 16 del Art. II de la Constitución son de aplicación al contrato de trabajo. Argumentan que en el Informe de la Comisión de Trabajo de la Cámara de Representantes al P. de la C. 507, que luego se convirtió en la Ley Núm. 87, aparece un comentario al efecto de que: "Esta Comisión entiende que los propósitos que animan al P. de la C. 507 responden a la política pública del gobierno de Puerto Rico, de proteger, con todos los recursos a la disposición del estado, los derechos de los trabajadores, tal y como estos han sido definidos en el Artículo II de nuestra Constitución y en los innumerables estatutos al respecto." *Diario de Sesiones 1962,* a la pág. 1382.

Esta afirmación quedó desvirtuada por manifestaciones del propio presidente de la Comisión de Trabajo en el hemiciclo, el señor Armando Sánchez Martínez, experimentado legislador en cuestiones laborales. Al discutirse el P. de la C. 507 el Sr. Sánchez Martínez admitió que dichos contratos no se regían por las leyes de Puerto Rico. Así lo expresó al responder al siguiente planteamiento que en ese sentido hizo un miembro de la Cámara de Representantes:

"SR. RIVERA MORALES: .

. . . Eso quiere decir que estos trabajadores, que se han acostumbrado ya a normas en Puerto Rico, establecidas, primero por convenios colectivos y luego por ley, donde a nadie se le ocurre en un convenio colectivo poner una semana de más de 40 horas ni más de seis días,—y que siempre, y en muchos convenios, toda vez que se trabaja más de medio día los sábados hay que pagar doble tiempo, y el domingo—, *en este caso el Departamento del Trabajo no debe sentirse orgulloso de entregarle un contrato a los trabajadores para autorizar a los agricultores en Estados Unidos que pongan a trabajar a estos compatriotas siete días a la semana y que se les pague tiempo sencillo, de acuerdo con lo que se ve de este contrato."

"Sr. Sanchez Martinez:

.    .    .    .    .    .    .    .

Claro, es bueno también señalar que aquí en Puerto Rico gozamos, sin lugar a dudas por una ley, de cómo se define la 'semana de trabajo' y cómo se define la 'jornada diaria de trabajo'. *Es decir, que aquí, cualquier convenio colectivo que se negociara, que estuviera por debajo de las disposiciones de la ley, sería completamente ilegal. Pero, desgraciadamente, no hay esas disposiciones de ley en ninguno de los Estados, para la fase agrícola, donde se negocian estos convenios colectivos . . . o estos convenios de protección para los trabajadores migrantes.* Quiere decir que, a pesar de esa dificultad, se han establecido garantías no existentes en legislación allí, se han asegurado las garantías de que habla ese contrato del Departamento del Trabajo en representación de los trabajadores migrantes." *Diario de Sesiones 1962,* a la pág. 1383.

Otro elemento que robustece la conclusión de que ni la Ley Núm. 87 ni el contrato de trabajo tuvieron la intención de hacer aplicable a los trabajadores migrantes la compensación extraordinaria, es que en el 1969, se derogó el reglamento que fuera promulgado por el Secretario del Trabajo en 12 de abril de 1948, mucho antes de la aprobación de la Ley Núm. 87 y del contrato aquí en cuestión, el cual disponía que: "El Secretario del Trabajo no aprobará ningún contrato cualquiera cuyos términos conflijan con las leyes del trabajo de Puerto Rico." La derogación de esta prohibición abona al entendimiento de las partes de que las leyes de Puerto Rico no eran aplicables a dicho contrato. (¹)

No hay duda de que si la Ley Núm. 87 hubiese dispuesto que las leyes laborales de Puerto Rico se aplicaban al contrato en cuestión estaríamos obligados a seguir el mandato legislativo. Podría argüirse, sin embargo, y así lo plantean los interventores, que no empece tal omisión la Sec. 16 del Art. II de la

---

(¹) Es de justicia señalar que fueron los propios interventores los que trajeron a nuestra atención dicho reglamento en su elaborado alegato.

Constitución se aplica de pleno derecho. (²) El argumento no es sostenible.

■ La Constitución y las leyes generalmente tienen el propósito de resolver situaciones de carácter interno del país y no para aplicarse a condiciones externas, salvo por mandato del legislador o por razones poderosas de política pública. No habiendo tal mandato en la Ley Núm. 87 ni en la Constitución examinemos la política pública del Estado Libre Asociado con respecto a los trabajadores migrantes a los fines de determinar si la aplicación de la Sec. 16 al contrato de trabajo en este caso promueve o vindica algún interés legítimo del Estado Libre Asociado.

La Exposición de Motivos de la Ley Núm. 25 de 5 de diciembre de 1947, 3 L.P.R.A. sec. 319, expone la política pública sobre trabajadores migrantes en la siguiente forma:

"La política pública del Gobierno de Puerto Rico, en lo que respecta a promover el bienestar de los trabajadores mediante empleos lucrativos y a la migración de puertorriqueños a los Estados Unidos Continentales y a otros países con los fines de obtener ocupación, es la que a continuación se expresa:

(a) . . . . . . . .
(b) . . . . . . . .
(c) La labor de orientación y guía que es deber del Gobierno de Puerto Rico realizar con respecto a la migración de trabajadores puertorriqueños a los Estados Unidos o a otros países deberá quedar enmarcada dentro de los siguientes principios básicos: (1) El Gobierno realizará todas las gestiones de educación, mejoramiento y orientación para que en todo momento la industria, la agricultura y el comercio de Puerto Rico retengan

---

(²)La Sec. 16 del Art. II de la Constitución lee:

"Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley."

el personal necesario para el desarrollo de nuestra producción hasta el máximo; (2) *se orientará a los trabajadores puertorriqueños interesados en migrar para que sólo vayan a los sitios donde exista una verdadera demanda de trabajo y su presencia en tales sitios no contribuya a una reducción en los salarios o a una perturbación en las condiciones de trabajo allí existentes; (3) En cualesquiera sitios a donde vayan los trabajadores puertorriqueños deberán obtener los mismos salarios y condiciones de trabajo que disfrutan los trabajadores naturales de o residentes en esos sitios....*

(d)  .   .   .   .   .   .   ."

3 L.P.R.A. sec. 319. (Énfasis suplido.)

La preocupación básica del legislador en cuanto a salarios concierne gira sobre dos intereses primordiales: a) la protección de los salarios y condiciones de trabajo existente en el área de empleo y b) la obtención para los trabajadores puertorriqueños de los mismos salarios y condiciones de trabajo que disfrutan los trabajadores naturales de o residentes en el área de empleo. No forma parte de esta política pública la obtención para los trabajadores migrantes de salarios y condiciones de trabajo más allá de las que prevalecen en el área de empleo. No podría ser el propósito del legislador promover un trato privilegiado para el trabajador puertorriqueño fuera de Puerto Rico porque ello no sólo sería contrario a nuestro sentido de justicia sino al principio que encarna la propia Sec. 16 que garantiza igual paga por igual trabajo.

La aplicación de la garantía a compensación extraordinaria a los trabajadores puertorriqueños que prestan servicios fuera de Puerto Rico les resultaría perjudicial pues, en efecto, les destruiría una fuente de trabajo adicional y de los ingresos consiguientes; ya que el imponer un trato privilegiado para nuestros trabajadores le estaríamos de hecho cerrando las oportunidades de trabajo en estados como Maryland y Delaware, por ejemplo, cuyas leyes no proveen el pago de compensación extraordinaria.

El reclamo de los interventores de que se les extienda la garantía constitucional en la misma forma que se aplica a los trabajadores que rinden labores en nuestro país resultaría pues en el contrasentido de que la igual protección de las leyes constituiría en este caso un privilegio repugnante a sí mismo.

Los interventores sostienen, además, que el contrato de trabajo debe regirse por las leyes de Puerto Rico porque éste es el estado donde existen los puntos de enlace o contactos más dominantes, a tono con la doctrina establecida en *Vda. de Fornaris* v. *Amer. Surety Co. of N.Y.*, 93 D.P.R. 29 (1966); *Maryland Cas'y. Co.* v. *San Juan Rac'g Assoc. Inc.*, 83 D.P.R. 559 (1961). Elaboran su argumento enumerando los diversos enlaces o contactos que surgen con respecto a este foro en comparación con los existentes en relación con el estado de Delaware. Entre ellos mencionan: 1) que los contratos se negociaron por el Secretario del Trabajo en Puerto Rico, 2) el reclutamiento de los trabajadores se llevó a efecto en Puerto Rico con la autorización del Secretario del Trabajo, 3) el contrato comenzó a efectuarse en Puerto Rico ya que el patrono se obligó a darle transportación desde aquí, 4) el patrono tiene que notificar a la División de Migración del Estado Libre Asociado el despido de cualquier trabajador, los récords de las nóminas, los accidentes de trabajo, 5) el patrono se somete a la jurisdicción de los tribunales de Puerto Rico, 6) los trabajadores están domiciliados en Puerto Rico y 7) el patrono tiene agente de reclutamiento en Puerto Rico.

■ La doctrina de los contactos dominantes no responde a criterios cuantitativos. No es el número de contactos lo que determina la ley aplicable sino la calidad de éstos en relación con la cuestión en controversia. Se trata más bien de un proceso analítico en que se evalúan los diversos contactos siguiendo los principios generales o factores que se han formulado por la doctrina científica para dirimir los conflictos de leyes. Véanse, Leflar, Robert, *American Conflicts Law,*

Caps. 10 y 11 (1959) ; Currie, Brainerd, *Selected Essays of the Conflicts of Law* (1963) ; Sherwood, Arthur, *The Transition from the Lex Loci Rule to the Dominant Contacts Approach*, 62 Mich. L. Rev. 1358 (1963–64) ; Coyne, Raymond, *Contracts, Conflicts, and Choice-Influencing Considerations*, U. Ill. L. F. 323 (1969) ; Reese, Willis, *Conflicts of Laws and the Restatement Second*, 28 Law & Contemp. Prob., 679 (1963) ; Weintraub, *The Contracts Proposals of the Second Restatement of Conflict of Laws—A Critique*, 46 Iowa L. Rev. 713 (1960–61) ; *Restatement, Conflict of Laws 2d*, secs. 6 y 188.

■ El *"Restatement"* formula los siguientes principios generales para guiar este proceso analítico: a) las necesidades del sistema interestatal e internacional, b) las normas relevantes de política pública del foro, c) las normas relevantes de política pública de otros estados interesados y los intereses relativos de esos estados en la determinación de la controversia, d) la protección de las expectativas razonables, e) las normas básicas de política pública relativas al campo específico de derecho en que surge la controversia, f) certeza, predictibilidad y uniformidad del resultado, g) simplificación de la determinación y aplicación de la ley a ser aplicable. *Op. cit.*, sec. 6, pág. 10. Leflar propugna una variante de estos principios resumiéndolos en los siguientes: a) predictibilidad del resultado, b) mantenimiento del orden interestatal e internacional, c) simplificación de la tarea judicial, d) promoción de los intereses fundamentales del foro y e) aplicación de la mejor regla de derecho, *op. cit.* a la pág. 245.

Estos principios se formulan meramente como guías generales que varían de importancia y de aplicación de acuerdo con la naturaleza del caso y de la controversia en cuestión. No hay unanimidad de criterios en la aplicación de los mismos, pero de todas maneras, en ausencia de normas legislativas apropiadas pueden ser de utilidad para orientar el ejercicio de discreción judicial en cada caso.

En el caso de autos son de especial consideración los principios relativos a las normas relevantes de política pública y a los intereses sociales afectados las cuales discutimos anteriormente. El análisis de los contactos mencionados por los interventores a la luz de las normas relevantes de política pública y de los intereses afectados nos convence que ninguno de esos contactos tiene la menor importancia en relación con el pago de compensación extraordinaria. Las gestiones efectuadas por el Secretario del Trabajo en relación con el contrato van dirigidas a promover la política pública establecida en la Ley Núm. 25 de 5 de diciembre de 1947, *supra*, que como sabemos, consiste en garantizar a los trabajadores migrantes los mismos salarios y condiciones de trabajo que disfrutan los trabajadores naturales o residentes en el *área de empleo*. Igualmente, las gestiones de los peticionarios relacionadas con el contrato y el reclutamiento de los trabajadores tampoco tiene relevancia alguna con la compensación extraordinaria.

Por otro lado, en un contrato de servicio como el de autos es de fundamental importancia el foro donde se han de prestar los servicios. Este es el contrato más significativo para determinar la ley aplicable con respecto a la compensación extraordinaria, ya que tanto el objeto del contrato como su causa —el rendimiento de los servicios y el pago de los salarios— ocurren allí. Es en dicho estado donde va a surgir la posibilidad de trabajar horas adicionales a la jornada acordada y donde las partes se van a poner de acuerdo al respecto. Es propio que cualquier controversia sobre esta cuestión se dilucide por las normas relevantes de política pública de ese foro. (3) De otra manera, se crearía un verdadero caos si cada

---

(3) El American Law Institute propugna una regla similar en el *Restatement, Conflict of Laws 2d*, sec. 196:

"La validez de un contrato para prestar servicios y los derechos que éste crea se determinan, en ausencia de selección eficaz por las partes, por la ley local del estado donde requiere el contrato que se presten los servicios, a menos que, respecto a la cuestión, algún otro estado tenga una conexión

estado aplicara sus propias leyes laborales a los trabajadores de origen que presten servicios en otros estados. Ello imposibilitaría la uniformidad en los salarios y las condiciones de empleo, que es el objetivo fundamental de nuestra política pública y que también lo es la de los estados de Maryland y Delaware a los que se les aplicara la ley Wagner-Peyser, 29 U.S.C. sec. 49, y su reglamento, 20 C.F.R. sec. 602-9 (c).

El análisis que hemos hecho precedentemente sobre la doctrina de contactos dominantes nos lleva a concluir que la garantía constitucional a compensación extraordinaria no es de aplicación a los obreros migrantes puertorriqueños que rinden labores agrícolas fuera de Puerto Rico.

*Se dictará sentencia revocando la aquí recurrida y ordenando la desestimación de las demandas consolidadas en este caso.*

El Juez Presidente Señor Trías Monge disiente reservándose el derecho de exponer por escrito sus puntos de vista oportunamente.

—O—

Opinión disidente emitida por el Juez Presidente, Señor Trías Monge.

San Juan, Puerto Rico, a 22 de diciembre de 1975

Disiento respetuosamente de la opinión mayoritaria. Las cuestiones aquí planteadas no pueden resolverse debidamente en ausencia de un récord adecuado. Tanto el Tribunal de Distrito como el Tribunal Superior se negaron, en parcas sentencias, a desestimar la demanda instada por los obreros migrantes o a declarar con lugar la sentencia sumaria que se solicitó en su contra. Hoy se revoca a ambas divisiones del Tribunal de Primera Instancia y se falla, sin más récord que

---

más significativa con el asunto y las partes bajo los principios expuestos en la sección 6, en cuyo caso se aplicará la ley de dicho otro estado." (Traducción nuestra.)

las alegaciones de las partes, que la Sec. 16 del Art. II de la Constitución del Estado Libre Asociado y la legislación que establece la jornada legal de trabajo en Puerto Rico no ampara a los obreros migrantes contratados para rendir servicios agrícolas temporeros en Estados Unidos. Considero que un asunto de esta magnitud y trascendencia debe examinarse tan sólo en el contexto más amplio posible de hechos, especialmente cuando el resultado y la doctrina a aplicarse pueden ser objeto de debate y cuando ambos forzosamente envuelven la evaluación de factores y realidades socio-económicas que deben ser objeto de prueba.

La primera dificultad estriba en determinar precisamente la norma de Derecho Internacional Privado aplicable al presente género de obligaciones. El sistema conflictual puertorriqueño, vale recalcar, es de raíz románica. En un tiempo se resolvió por este Tribunal que el Derecho Internacional Privado de este país debe regirse por las normas desarrolladas al efecto en Estados Unidos. *Cruz* v. *Domínguez*, 8 D.P.R. 580 (1905). Véanse: *Colón* v. *Registrador*, 22 D.P.R. 369, 374–375 (1915); *Lopkez* v. *Fernández*, 61 D.P.R. 522 (1943). Tal posición no es correcta. Velázquez, Guaroa, *Directivas Fundamentales del Derecho Internacional Privado Puertorriqueño*, Ed. U.P.R. 1945, págs. 42–43, 94. Aunque ciertas cláusulas de la Constitución de Estados Unidos pueden afectar la aplicación de una regla a un caso específico, la fuente primaria de nuestro Derecho Internacional Privado es incuestionablemente nuestro Código Civil.

Nuestro Código Civil, sin embargo, al igual que el Código Civil Español antes de la reforma de su Título Preliminar en 1974, regula muy fragmentariamente la materia contractual en este campo. Dado el silencio del Código sobre el asunto que nos ocupa es nuestro deber, en consecuencia, acudir a las disposiciones de su Art. 7 y resolver la cuestión conforme a equidad. 31 L.P.R.A. sec. 7. Podemos en tales circunstancias examinar libremente las normas de colisión

propuestas en diversos lugares, aunque teniendo en cuenta, en la terminología del Art. 7, "la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos." La necesidad de compenetrarnos de estos usos y costumbres de por sí aconseja el desfile de prueba para su identificación segura y la selección o forjación de la norma adecuada bajo el Art. 7.

Se han propuesto teorías muy diversas para resolver los conflictos de leyes en la zona contractual. Pueden mencionarse la de la nacionalidad (*lex patriae*); la del domicilio o residencia habitual (*lex domicilii*); la del lugar donde se celebra el contrato (*lex loci contractus*); la del sitio donde ha de cumplirse la obligación (*lex loci executionis*); la de la autonomía de la voluntad; la de los derechos adquiridos; la de los puntos de conexión, contacto o coligamiento; la del foro (*lex fori*); y la funcional. Existen muchas otras, a las que tendremos ocasión de referirnos más tarde.

El sueño de formular una regla válida para todas las épocas y todos los tipos de obligaciones se ha ido desvaneciendo con los años. Se ha tendido crecientemente a particularizar, a distinguir entre la riqueza de figuras jurídicas que abarcan los contratos. En este sentido conviene repasar distintas experiencias en el análisis del problema específico con que nos confrontamos. Veremos que a veces se sacrifica la justicia para lograr certeza. Se trata de modo simplista un problema esencialmente complejo. No se consideran hechos y factores que es indispensable tener en cuenta. No se distingue debidamente entre figuras superficialmente similares pero fundamentalmente diversas.

Al contrato de trabajo ya se le reconoce por muchos categoría separada, aunque no se intenta por lo general continuar el proceso de diferenciación en esta esfera y a veces se agrupa todo bajo la clasificación excesivamente general de relaciones laborales. Veamos algunos enfoques y propuestas.

El Código Bustamente, vigente en la mayoría de los países latinoamericanos, dispone en su Art. 198: "También es territorial la legislación sobre accidentes del trabajo y protección social del trabajador." Para su texto, véase: Abraham, J. M., *Código de Derecho Internacional Privado*, Caracas, 1955. El Art. 10-6 del nuevo Título Preliminar Español, Decreto 1836 de 31 de mayo de 1974, fundado en la Ley de Bases de 17 de marzo de 1973, provee:

"A las obligaciones derivadas del contrato de trabajo, en defecto de sometimiento expreso de las partes y sin perjuicio de lo dispuesto en el apartado 1 del artículo 8, (1) les será de aplicación la Ley del lugar donde se presten los servicios." 69 R.G.L.J. 214 (1974).

La Comunidad Económica Europea ha venido discutiendo un Convenio para uniformar su Derecho Internacional Privado relativo a las obligaciones. Las normas propuestas son distintas a las del antiguo Código Bustamente y a las del actual Título Preliminar del Código Civil Español. Se provee en el Art. 5 de la convención mencionada:

"En ausencia de una selección expresa o implícita, los contratos relativos a las relaciones obrero-patronales se gobernarán por la ley del Estado

a) donde el trabajador labore habitualmente, o

b) si el obrero no trabaja habitualmente en un Estado, donde el contratista tenga su negocio, a menos que resulte a la luz de las circunstancias que el contrato de trabajo tenga conexión más estrecha con otro Estado." (Traducción nuestra.) 21 Am. J. Comp. L. 588 (1973).

El Art. 2(3) de la Convención condiciona, no obstante, lo transcrito, ya que advierte que "en los contratos relativos a las relaciones obrero-patronales, la selección por las partes de la ley aplicable no afectará las disposiciones obligatorias

---

(1) Este apartado dispone que "Las leyes penales, las de policía y las de seguridad pública obligan a todos los que se hallen en territorio español."

aprobadas para la protección del obrero en el Estado donde él trabaja habitualmente." 21 Am. J. Comp. L. 587 (1973).

En los Estados Unidos privan diferentes criterios. En términos generales, las cortes han sido renuentes a imprimirles efecto extraterritorial a los estatutos en ausencia de un mandato legislativo expreso. Rothman, *Conflict of Laws in Labor Matters in the United States*, 12 Vand. L. Rev. 997 (1959). El Tribunal Supremo de los Estados Unidos les dio efecto extraterritorial, no obstante, en un caso de historial legislativo no del todo claro sobre este punto, a las disposiciones de la Ley Federal de Normas Razonables del Trabajo relativas precisamente al pago de horas extras. *Vermilya-Brown Co.* v. *Connell*, 335 U.S. 377 (1948).

En la segunda reformulación del derecho norteamericano sobre esta materia, *Restatement, Conflict of Laws 2d*, sec. 196, se dispone:

"La validez de un contrato para prestar servicios y los derechos que éste crea se determinan, en ausencia de selección eficaz por las partes, por la ley local del estado donde requiere el contrato que se presten los servicios, a menos que, respecto a la cuestión, algún otro estado tenga una conexión más significativa con el asunto y las partes bajo los principios expuestos en la sección 6, en cuyo caso se aplicará la ley de dicho otro estado." (Traducción nuestra.)

La referida Sec. 6 provee:

"(1) Sujeto a restricciones constitucionales, los tribunales acatarán el mandato legislativo de su propio estado respecto a la selección de la ley a aplicarse.

"(2) Cuando no exista tal mandato, los factores relevantes para efectuar la selección referida incluyen

(a) las necesidades de los sistemas interestatal e internacional;

(b) las políticas relevantes del foro;

(c) las políticas relevantes de otros estados interesados y los intereses relativos de dichos estados en la determinación del asunto en cuestión;

(d) la protección de esperanzas justificadas;

(e) las políticas básicas del foro en el campo de ley concernido;

(f) la certeza, pronosticabilidad y uniformidad del resultado; y

(g) la facilidad en la determinación y aplicación de la norma a regir." (Traducción nuestra.)

Otro enfoque que se recomienda es evitar el problema o reducir sus proporciones mediante tratados o pactos bilaterales o multiestatales. Goldberg, *Labor Relations and Labor Standards for Employees of United States Enterprises Working in Foreign Areas*, 48 N.D.L. Rev. 23 (1971). Debe señalarse que la actual práctica del gobierno de Estados Unidos al respecto es pagarles horas extras a los extranjeros que contrata en el exterior para trabajar fuera de su país. *Offshore Labor Agreement with the Republic of the Philippines*, TIAS 3646, 7 U.S.T. 2539, 19 U.S.T. and O.I.A., pág. 7560, tratado firmado en Manila el 28 de diciembre de 1968.

Otra posición, particularmente sensitiva a la naturaleza del contrato de empleo, consiste en sostener que las normas usualmente propuestas en este campo no producen resultados necesariamente justos y que la regla conflictual preferible es establecer que en todo caso se aplicará la ley que le brinde mayor protección al obrero o la ley de la parte más débil o, hasta el extremo que fuese posible conjugarlas, las distintas leyes envueltas. Para una ilustración de esta teoría, véase: Cavers, David F., *The Common Market's Draft Conflicts Convention on Obligations: Some Preventive Law Aspects*, 48 So. Cal. L. Rev. 603, 620, 625 (1975).

Lo cierto es que hay tal variedad de doctrinas que el resultado en la realidad depende de la que se escoja. En ocasiones de esta naturaleza debe ejercerse particular cautela para que la norma seleccionada responda debidamente a los fines del derecho y al contexto en que opere. La situación se complica si advertimos que en realidad nos confrontamos a una figura jurídica con características propias, que puede exigir la creación de una norma especial o alterar dramáticamente la

selección y aplicación de una regla desarrollada para otras circunstancias. No se trata aquí de un contrato ordinario de empleo. Se trata de un contrato de empleo en masa para trabajar temporeramente en el exterior. Considero que este Tribunal no debe resolver en abstracto cuestión tan delicada como la de pautar el desarrollo de contrato tan atípico y vital.

Como índice de la complejidad del contrato de empleo en masa, examinemos algunos datos sobre el movimiento migratorio mexicano a Estados Unidos y las razones históricas para la utilización allí de obreros migrantes, extranjeros y domésticos, en labores agrícolas. Las dificultades que presentaba la situación produjeron el intento de reducir los problemas de Derecho Internacional Privado y de otra índole envueltos mediante legislación especial por el Congreso de Estados Unidos, 65 Stat. 119 (1951), 7 U.S.C.A. secs. 1461–68 (1958), y la celebración de un tratado entre Estados Unidos y México. *Migrant Labor Agreement of 1951 with Mexico,* 11 de agosto de 1951, 2 U.S.T. and O.I.A. 1968. Se establecieron diversas garantías para proteger al migrante extranjero. Entre éstas se encontraban disposiciones sobre el salario mínimo y la aplicable respecto al pago de horas extras. La operación del programa produjo grave insatisfacción tanto en Estados Unidos como en México. El Secretario Auxiliar del Trabajo de Estados Unidos concluyó, en testimonio ante el Congreso, que el programa había afectado adversamente la posición del trabajador agrícola doméstico en Estados Unidos. Spradlin, *The Mexican Farm Labor Importation Program—Review and Reform,* 30 Geo. Wash. L. Rev. 84, 99–100 (1961). El gobierno de México quedó profundamente insatisfecho a su vez con las condiciones de trabajo a que se sujetaba al obrero mexicano. En consecuencia, se abrogó el tratado de 1951. 14 U.S.T. 307.

Aun la situación de los propios migrantes agrícolas norteamericanos se ha descrito así por Arthur J. Goldberg, entonces Secretario del Trabajo, en palabras severas y reveladoras:

"La mayoría de los migrantes americanos . . . viven por lo general en un mundo ensombrecido por la pobreza, la privación, la ausencia de oportunidades y condiciones de vida intolerables desde cualquier punto de vista . . . . Se les aloja en viviendas insanitarias e inadecuadas; se les transporta en camiones y autobuses inseguros que los ha expuesto a un alto número de accidentes que han resultado en muertes y heridos graves. La condición de estas familias constituye una afrenta al concepto americano de la dignidad humana.

La verdad desagradable es que el sistema migratorio en Estados Unidos se funda en el infraempleo, el desempleo y la pobreza . . . . A los trabajadores agrícolas se les excluye del salario mínimo, del seguro contra el desempleo, de casi toda la legislación sobre accidentes del trabajo y de otra legislación social. Se les excluye, además, de las leyes que protegen el derecho de los trabajadores a organizarse y a negociar colectivamente con sus patronos." (Citado por Spradlin, *supra,* 97–98; traducción nuestra.)

Los migrantes agrícolas se han utilizado frecuentemente en Estados Unidos para impedir el alza de salarios bajos, para desalentar la organización de uniones obreras y como rompehuelgas. Spradlin, *passim.* El argumento de que no se podía pagar más para mejorar la indecorosa situación condenada por Goldberg fue refutado por el Departamento del Trabajo de Estados Unidos, el cual señaló que los costos de la mano de obra para el período bajo estudio representaron tan sólo el 11.5% de los costos de la producción agrícola para dicho término, lo que significaba que los salarios agrícolas tenían que aumentar 8% para que el aumento en los costos de producción se acercase al 1%. Spradlin, *op. cit.,* 112.

La Ley Núm. 25 de 5 de diciembre de 1947, 3 L.P.R.A. sec. 319, Exposición de Motivos, apartados (c) (2) y (4), revela una clara conciencia de los problemas señalados por Goldberg y Spradlin al expresar que "se orientará a los trabajadores puertorriqueños interesados en migrar para que sólo vayan a los sitios donde exista una verdadera demanda de trabajo y su presencia en tales sitios no contribuya a una re-

ducción en los salarios o a una perturbación en las condiciones de trabajo allí existentes;" y que "Es deber del Gobierno de Puerto Rico informar adecuadamente a los puertorriqueños que se proponen migrar a Estados Unidos o a otros países, antes de salir de la Isla, respecto a sus responsabilidades para con la industria y el trabajo organizado." Estimo por varias razones que debemos tener ante nuestra consideración las circunstancias en que se les pedía alegadamente a los obreros demandantes trabajar horas extras y aun el sétimo día. La cuestión constitucional envuelta no se limita, en primer término, al alcance de la Sec. 16 del Art. II de la Constitución de Puerto Rico. Hay que enfrentarse también a las disposiciones de la Sec. 1 de dicho artículo, que ordena que "La dignidad del ser humano es inviolable . . . ." ¿Está este Tribunal verdaderamente preparado para decir que bajo ninguna circunstancia imaginable el pago a tiempo sencillo de las horas extras y la negación al derecho al sétimo día pueden confligir con tal disposición? ¿O es que el Departamento del Trabajo de Puerto Rico no puede violar la dignidad del ser humano en nuestros 10,000 kilómetros cuadrados, pero puede autorizar contratos para que se viole la dignidad del puertorriqueño fuera de aquí? Sé que no es la intención del Tribunal sancionar condiciones inaceptables para los obreros, pero tal podría ser el resultado de una decisión fundada en un récord incompleto.

La opinión del Tribunal le aplica, en segundo término, la doctrina de los puntos de contacto, en su versión norteamericana, a la figura atípica del contrato de empleo en masa para trabajo temporero en el exterior. Aun desde tal punto de vista también es difícil justificar la decisión de este caso por la vía sumaria. Para analizar debidamente en este caso los principios expuestos en la Sec. 6 del *Restatement*, antes citados, urge contar con mayor información de la que dispone esta Corte. Entre los puntos de conexión a evaluarse, por ejemplo, están "las necesidades de los sistemas interestatal e inter-

nacional." ¿No convendría tener ante nosotros los datos sobre este asunto en vez de expresarnos en el vacío? Lo mismo puede decirse de otros puntos de contacto: "las políticas básicas del foro en el campo de ley concernido"; "la protección de esperanzas justificadas." El Tribunal afirma que "se crearía un verdadero caos si cada estado aplicara sus propias leyes laborales a los trabajadores de origen que presten servicios en otros estados." ¿Por qué? Los países de tradición civilista que constituyen el Mercado Común Europeo, en conocido esfuerzo de superar las normas del *Restatement* sobre Derecho Internacional Privado, están considerando precisamente el rechazo de la *lex loci executionis* para permitir, en aras de la justicia, la aplicación de leyes dispares y la consiguiente creación de un "caos" comparable al que atemoriza a este Tribunal. Cabe preguntar además, ¿qué "caos" es más temible, el que rompe un simple orden formal o el que expone al obrero migrante a la injusticia y la indignidad?

Señala el Tribunal igualmente que de no seguirse la ley del foro donde se han de prestar los servicios, "Ello imposibilitaría la uniformidad en los salarios y las condiciones de empleo, que es el objetivo fundamental de nuestra política pública y que también lo es la de los estados de Maryland y Delaware. . . ." Los argumentos que se aducen para sostener estas aseveraciones no son del todo convincentes. Los contratos que obran en autos imponen diversas condiciones de trabajo para el trabajador puertorriqueño que superan las que privan bajo las leyes de Delaware y Maryland. Si alguna afirmación de esta naturaleza se justifica es la contraria. La legislación laboral de nuestro país se caracteriza más bien por el deseo de mejorar los salarios y las condiciones de vida de los trabajadores hasta el máximo compatible con nuestras necesidades de crecimiento económico y por el objetivo de que la migración puertorriqueña no contribuya a la perturbación de las posibilidades de mejoramiento de las condiciones de trabajo en otras jurisdicciones.

El nervio de la opinión del Tribunal reside, no obstante, a todas luces, en la aseveración de que de no aplicarse la ley del lugar donde se ha de cumplir la obligación "se lesionaría el interés legítimo de esos estados en promover su desarrollo agrícola a la misma vez que destruiría una fuente adicional de empleo para los trabajadores migrantes puertorriqueños." Simpatizo obviamente con ambos propósitos, pero el problema, en esta etapa de los procedimientos, es otro. ¿A base de qué evidencia concluye el tribunal que, de aplicarse la ley del foro, se lesionaría el desarrollo agrícola de Maryland y Delaware o se destruirían oportunidades de empleo para nuestros obreros migrantes? ¿Qué base hay para concluir que no puede absorberse el costo adicional? ¿Qué prueba existe que, de no doblegarse los migrantes puertorriqueños a las condiciones requeridas, tan extrañas a nuestros usos, existe otra masa de trabajadores que habrá de suplantarlos? Se entiende, además, que aunque el trabajo es naturalmente preferible al desempleo, existen límites a las condiciones del trabajo que pueden imponerse. Nos hemos referido a manifestaciones de un antiguo Secretario del Trabajo sobre las condiciones lesivas a la dignidad humana en que vive y labora el migrante. ¿No convendría explorar todos estos asuntos a fondo, en juicio plenario, para constatar los hechos, antes de expresarnos finalmente sobre los mismos?

La opinión de la mayoría concluye que la intención legislativa ha sido no extender las garantías constitucionales y estatutarias a los obreros migrantes. Aun cuando esta conclusión estuviese acertada esto de por sí no resuelve la controversia planteada. La intención legislativa no es sino un aspecto a considerar dentro de algunas de las teorías de conflictos de leyes que debemos examinar. Además, el examen del historial de la legislación protectora de los obreros migrantes puertorriqueños nos lleva *prima facie* a una conclusión contraria. La protección del obrero migrante puertorriqueño se remonta a la Ley Núm. 19 de 29 de mayo de 1919. La Ley Núm. 89 de 9 de

mayo de 1947 reforzó esta política. Fue bajo sus disposiciones que se aprobó, el 12 de abril de 1948, un Reglamento en que se dispuso que "El Secretario del Trabajo no aprobará ningún contrato, cualesquiera de cuyos términos conflijan con las leyes del Trabajo de Puerto Rico." Esta era la situación de ley cuando se forjó la Constitución de Puerto Rico, que abrió brecha al crear en efecto una Carta de Derechos del Trabajador. En la Sec. 16 del Art. II de la Constitución se expuso terminantemente:

"Se reconoce el derecho de todo trabajador . . . a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menos de una vez y media el tipo de salario ordinario, según se disponga por ley."

La Comisión de la Convención Constituyente a cargo de esta materia se expresó así en su informe sobre la totalidad de la sección que incluye las disposiciones citadas:

"La Comisión subraya la alta dignidad del esfuerzo humano y destina esta sección al señalamiento de los derechos básicos del trabajador como tal. Coloca particular énfasis en aquel grueso de la clase trabajadora que por razón de especial desvalimiento históricamente ha necesitado, aunque no siempre ha recibido, protección social." 4 *Diario de Sesiones de la Convención Constituyente* 2573.

En los debates no se discute el punto expreso sobre la intención o no de que esta disposición se aplicase al migrante temporero, pero se recalcó la importancia de la compensación extraordinaria, no tanto como medio para el pago de una compensación justa, sino como mecanismo disuasivo para la extensión de la jornada diaria más allá de las ocho horas, para evitar la fatiga, las enfermedades, la acortación de la vida del trabajador y la explotación humana. Es difícil pensar que la intención de la Sec. 16 pudiese haber sido proteger la salud del trabajador en Puerto Rico, pero no la del migrante temporero que habría de regresar a este país a sufrir las consecuen-

cias del trabajo excesivo. 3 *Diario de Sesiones de la Convención Constituyente* 1622–3, 2247–2262, 2278–86.

Cuando se aprueba nuestra Constitución, por tanto, la norma familiar era que las leyes del trabajo de Puerto Rico protegían tanto al trabajador aquí como al migrante contratado a través del Estado. ¿No es razonable suponer, en ausencia de expresión en contrario y dados los propósitos que animaron la redacción de la Sec. 16 del Art. II, que la intención de la Convención Constituyente fue continuar la situación existente en derecho? En este sentido no alcanzo a entender el énfasis en la opinión del Tribunal en el hecho de que en la Exposición de Motivos de la Ley Núm. 379 de 15 de mayo de 1948, relativa a la jornada legal de trabajo, se habla de la jornada legal de trabajo *en* Puerto Rico. No había razón para expresarse de otro modo en dicha ley. La reglamentación vigente al momento de su aprobación protegía adecuadamente al migrante puertorriqueño.

No estoy expresando un criterio constitucional definitivo. Lo que deseo señalar es que la actual controversia es lo suficientemente complicada para ameritar que las cuestiones constitucionales que presenta se enmarquen dentro del contexto de hechos económicos y sociales más amplio posible. Por tratarse aquí de una moción de desestimación o sentencia sumaria donde se ha admitido la labor adicional realizada, las cuestiones que se le plantean al Tribunal aparentan ser de índole jurídica exclusivamente. Hemos visto, no obstante, la variedad de hechos que deben conocerse para estar en condiciones óptimas para resolver tales cuestiones de derecho. La supervivencia tan sólo de cuestiones de derecho en un litigio no priva de por sí al Tribunal de su facultad de negarse a decidirlas hasta que el caso esté debidamente maduro y se pueda determinar con la máxima precisión el impacto socio-económico de las normas a sentarse.

En resumen, la opinión del Tribunal entraña dificultades respecto a la clasificación del contrato envuelto aquí; respecto

a la norma de Derecho Internacional Privado aplicable a este caso, lo cual, conforme la doctrina moderna, no sólo permite sino que exige la utilización de las técnicas del Derecho Comparado, Von Mehren, *Recent Trends in Choice-of-Law Methodology*, 60 Cornell L. Rev. 927 (1975); respecto a la aplicación de los propios principios conflictuales que escoge el Tribunal; y respecto al análisis de los problemas constitucionales planteados. Considero, con toda deferencia al criterio contrario, que el curso más prudente en estas circunstancias es la negativa a resolver un caso de esta índole, tan necesitado de prueba, por la vía sumaria.

Confirmaría en consecuencia la sentencia dictada y devolvería el caso al Tribunal Superior para la continuación allí de los procedimientos.

—O—

Voto particular del Juez Asociado, Señor Negrón García.

San Juan, Puerto Rico, a 22 de diciembre de 1975

Estando conforme con la opinión del Tribunal, bastaría de ordinario mantener silencio, y ello representaría mi consciencia judicial de que respeto, aunque discrepo, del examen que la opinión disidente hace sobre el historial constitucional y legislativo de la extraterritorialidad de la compensación adicional a tiempo y medio y su aplicabilidad al obrero migrante. No obstante, el tipo de análisis y conclusión que propone la disidencia me obligan a radicar el presente voto particular.

Primeramente, el programa de obreros migrantes de Puerto Rico no "se funda en el infraempleo, el desempleo y la pobreza" a que se refirió en una ocasión, con relación a los migrantes agrícolas norteamericanos, el ex-Secretario del Trabajo federal Arthur J. Golberg, por el solo hecho de que jurídicamente su Constitución no pueda extenderse, como fuera mi deseo, más allá de sus fronteras en un extremo tan limitado como el de la compensación a tiempo y medio. Con-

forme lo demuestra una lectura del contrato típico correspondiente a un obrero migrante, nuestra legislación especial, de vanguardia social, no ". . . les excluye de salario mínimo, del seguro contra el desempleo, de la legislación sobre accidentes del trabajo y de otra legislación social . . . de las leyes que protegen el derecho de los trabajadores a organizarse y a negociar colectivamente con sus patronos."

En segundo término, en estricto análisis de metodología judicial, no es apropiado que para llegar a un resultado específico sobre la cuestión constitucional envuelta, se acuda e invoque un posible convenio *en discusión* ante la Comunidad Económica Europea, ni al Código de Bustamante, como tampoco a tratados o pactos bilaterales (Filipinas y Méjico) o multiestatales, los cuales claramente responden a situaciones socio-económicas y políticas distintas a las imperantes en nuestra jurisdicción. La solución exige, como lo hace la opinión mayoritaria, de un análisis desapasionado y jurídico en ordenado y lógico balance de los principios y doctrinas vigentes sobre el particular.

En tercer lugar, invocar en el caso de autos la norma por excelencia de equidad del Art. 7 de nuestro Código Civil (31 L.P.R.A. sec. 7), y proponer que su resultado dependa del examen libre de los usos y costumbres, relegándose a segundo plano una ley especial y un claro historial legislativo al efecto, constituye un peligroso y equivocado método de resolver cuestiones jurídicas, capaz de indebidamente reconocer derechos donde no los hay o enervarlos donde existen.

En cuarto término, a mi juicio la disidencia parte de unas premisas académicas erróneas para postular finalmente, sin fundamentos jurídicos, una contradicción al concluir que no expresa ". . . un criterio constitucional definitivo", ello bajo el constante argumento de que debe ventilarse prueba para examinarse las condiciones de nuestros emigrantes. La aparente lógica de tal razonamiento se desvanece ante la siguiente realidad: la solución judicial correcta en torno a la extraterri-

torialidad de la disposición constitucional sobre compensación adicional a tiempo y medio, no puede hacerse depender de las demás condiciones de trabajo de los obreros migrantes; aplica o no, en virtud de la interpretación de la Ley Fundamental según implementada para la protección de tales obreros en el mandato legislativo contenido en la ley especial Núm. 87 de 22 de junio de 1962 y su historial (29 L.P.R.A. sec. 526 *et seq.*), y no en orden a las pruebas que oportunamente puedan presentarse sobre otras condiciones de trabajo, las cuales resultan obviamente irrelevantes a la cuestión de derecho envuelta ante el foro judicial por pertenecer al ámbito de la discusión de las otras ramas de gobierno.

No puede proponerse válidamente que la conclusión judicial final al respecto esté vinculada a que la economía agrícola de los estados de Maryland y Delaware—o en el mañana de cualesquiera de los otros cuarenta y ocho (48) estados de la Unión en que puedan laborar nuestros migrantes—puedan absorber el costo adicional de la compensación reclamada, o a la posibilidad de que los migrantes puertorriqueños sean o no suplantados por otros trabajadores. Tales factores no sólo son inestables y ajenos a la controversia jurídica, sino que no pueden ser determinantes para el reconocimiento o negatoria del derecho pretendido bajo la tesis de que su naturaleza es "ex proprio vigore" y su extraterritorialidad automática.

Para cualquier estudioso o participante de los debates de nuestra Convención Constituyente no puede haber dudas de que nunca se contempló que la compensación a tiempo y medio fuera aplicable extraterritorialmente. Una lectura de los debates demuestra que la versión original y las enmiendas producidas que culminaron en el texto vigente, tomaban como marco de referencia la situación *interna* prevaleciente en Puerto Rico, inclusive varios decretos vigentes promulgados por la Junta de Salario Mínimo y sus efectos sobre el clima industrial en nuestro país. 3 *Diario de Sesiones de la Convención Constituyente,* págs. 2247–2248, 2250–2259, 2278–2279.

Uno de los más firmes proponentes de la misma, el delegado Sr. Padrón Rivera, líder obrero, resumió el problema del siguiente modo:

"Yo por eso creo, señorita Presidenta, que la Constituyente, obró inteligentemente enfocando el problema precisamente para no crearle inconveniente *al proceso industrial* y precisamente para establecer armonía entre el capital y el trabajo tan necesaria en estos momentos para evitar los movimientos subversivos que, escudados con el nombre de la huelga, evolucionan para destruir lo que nosotros hacemos en el enfoque justo y humano *de establecer aquí un sistema industrial* de paz, progreso y armonía." *Op. cit.*, págs. 2286–2287. (Énfasis suplido.)

Finalmente, la disidencia vulnera el sencillo principio de que los méritos de una moción de desestimación se examinan a la luz de las alegaciones de un reclamante y no en concepciones especulativas del juzgador.

Por estimar que los tribunales de justicia existen para resolver controversias y no para crearlas o perpetuarlas en "toda circunstancia imaginable"—ante lo que respetuosamente considero una tendencia cuestionable reflejada en la disidencia de proponer soluciones o proyectar posiciones de liberalidad teórica—es que reafirmo sin reservas mi conformidad con los términos de la opinión del Tribunal.